**EQUIFAX, INC., Petitioner,**

v.

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 78–3089.**

United States Court of Appeals,
Ninth Circuit.

April 30, 1980.

J. Wallace Adair, Francis A. O'Brien, Albert O. Cornelison, Howrey & Simon, Washington, D. C., Kent E. Mast, Atlanta, Ga., for petitioner.

Mark W. Haase, Washington, D. C., for respondent.

Before COWEN,* Senior Judge, TRASK and HUG, Circuit Judges.

TRASK, Circuit Judge:

Equifax appeals from a Federal Trade Commission (FTC) order finding that Equifax violated section 7 of the Clayton Act, 15 U.S.C. § 18,[1] by acquiring three credit bureaus in 1970 and 1971, thereby lessening competition in the "local credit reporting" service market.

■ The complaint in this action charged the Retail Credit Company, now known as Equifax, Inc. (Equifax), with violating section 7 of the Clayton Act (15 U.S.C. § 18)

and section 5 of the Federal Trade Commission Act (15 U.S.C. § 45),[2] by reason of its acquisitions of Credit Bureaus, Inc., Salem, Oregon (CB West Coast) in January 1970, of the Credit Bureau, Inc., Washington, D.C. (CBDC) in October 1970, and of the credit reporting assets of the Retail Credit Association of Portland, Oregon, Inc. (CB Portland) in January 1971. The complaint charged that these acquisitions would have the probable effect of substantially lessening competition in the "credit reporting" product market, and various product submarkets both in the United States as a whole and in several sections of the country, including Washington, D.C.; the San Francisco Bay Area; Portland, Oregon; Tacoma, Washington; and other metropolitan areas in the Pacific Northwest. We must affirm the FTC's findings if they are supported by substantial evidence. 15 U.S.C. § 45(c); *Ash Grove Cement Co. v. FTC*, 577 F.2d 1368, 1378 (9th Cir.), *cert. denied*, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, [86 S.Ct. 1018, 1026, 16 L.Ed.2d 131] (1966)." *RSR Corp. v. FTC*, 602 F.2d 1317, 1320 (9th Cir. 1979).

After a lengthy hearing on the merits, the Administrative Law Judge (ALJ) rendered his decisions finding that the acquisition of CBDC eliminated Equifax as a potential competitor in the Washington, D.C. local credit reporting market; the acquisition of CB Portland eliminated Equifax as a

---

* Honorable Wilson Cowen, Senior Judge, United States Court of Claims, sitting by designation.

1. 15 U.S.C. § 18 provides in pertinent part: No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

2. 15 U.S.C. § 45 provides in pertinent part:
(a) Declaration of unlawfulness; power to prohibit.
(1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

(6) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce.

substantial actual competitor in the Portland, Oregon local credit reporting market; and the acquisition of CB West Coast eliminated Equifax as a substantial actual competitor in the Tacoma, Washington local credit reporting market. The ALJ rejected the remaining complaint allegations and ordered a partial divestiture of CB West Coast and a total divestiture of both CBDC and the acquired assets of CB Portland. The case then came before the FTC on cross-appeals filed by complaint counsel and Equifax.[3]

The FTC agreed with the ALJ's decisions in most respects, but substituted its own determinations for those of the ALJ in several respects. First, the FTC found that Equifax's acquisition of CB West Coast reduced actual competition in the San Francisco Bay Area market as well as in the Tacoma market. Second, the FTC rejected the ALJ's "potential competition" analysis of the Washington, D.C. market, finding instead that Equifax's acquisition of CBDC decreased *actual* competition in that market. The FTC's remedial order directed that Equifax divest itself of CBDC and of the CB West Coast chain, including its California operations, with the exception that in Portland, Oregon, Equifax was permitted to retain its acquisition but was ordered to aid in establishing a new competitor by providing a suitable purchaser with credit data files.

I

Petitioner began operations in Atlanta, Georgia in 1899 as a credit bureau. Directly or through its subsidiaries, Equifax now furnishes financial and credit reports to various business enterprises that wish to evaluate the credit integrity of individuals who seek credit; provides personnel selection reports to potential employers of industrial, commercial and financial concerns; and also furnishes life insurance companies with relevant information. In 1970, insurance reporting accounted for most of respondent's business volume.

Petitioner owns all of the stock of eight subsidiary companies. Its subsidiary, The Credit Bureau, Inc. of Georgia (CBI), provides credit reports on consumers, personnel reports and collection services and credit card promotions for credit grantors in the United States. Its credit grantor customers are mostly department stores, retailers, banks and credit card companies. At the end of 1959, CBI owned 22 credit bureaus. Ninety-four acquisitions were made from 1960 through January, 1971 by which time CBI owned 115 credit bureaus in the United States and five bureaus in Canada. Prior to the contested acquisitions, CBI's credit bureau offices were located primarily in the southeastern United States and the New York-New Jersey metropolitan area. CBI's revenues from credit reporting services, excluding dues and promotions, amounted to $8,429,000 in 1969.

Retailers Commercial Agency, Inc. (Retailers), acquired by petition in 1934, produces credit reports, primarily "character credit reports." These are frequently compiled through investigations conducted by Retailers' employees and include special-purpose "mortgage reports," that is, reports on individuals applying for mortgage loans from banks or other lending institutions, and personnel reports. Retailers is regarded as an operating unit of petitioner.

Equifax, through its own offices, has provided information to insurance companies for use in determining insurability and ratings or classifications for life, health, property, marine, and automobile insurance purposes. Written reports are prepared on the basis of investigations conducted by field representatives. These offices also provide a variety of credit information services, including mortgage reports and reports to businesses on prospective employees. Equifax has described itself (and its subsidiaries) as one of the leading businesses in the United States engaged in providing information for use in underwriting insurance, investigation and adjustment of insurance claims, granting of credit, and selection of person-

---

**3.** Complaint counsel have not appealed from the ALJ's determinations concerning product and geographic submarkets outside of the San Francisco Bay Area.

nel. Its total revenue in 1971 was $190 million.

## II

In reaching its conclusion that Equifax's acquisitions adversely affected actual competition, the FTC was concerned with the activities of the credit bureau acquisitions and Equifax's subsidiary, Retailers. Retailers was engaged in the production of "mortgage reports" for customers interested in the character and financial status of prospective mortgagors. The credit bureaus produced "credit reports" which were used by various consumer credit lenders, especially department stores, who were interested in the bill-paying habits of prospective credit customers. The FTC, while admitting that the two types of reports were "not identical and [were] differently priced," found that the reports were "substantially identical" and contained much of the same information. The FTC, however, based its determination that the two report types were within the same product market on the ground that a "commonality of production techniques" existed resulting in a substantial elasticity on the supply side of the market. On this appeal, Equifax challenges the inclusion of "mortgage reports" in the same product market as "credit reports."

■ A determination of the relevant service market is, of course, a necessary predicate to finding a violation of section 7 of the Clayton Act. See Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1270–71 (9th Cir. 1975). The product market and the geographic market are two components of the service market. Important considerations in determining the boundaries of the appropriate product market include "such practical indicia as industry or public recognition of the [product's market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510

(1962). While conceding that most of these factors would indicate that credit and mortgage reports should be characterized within different product markets, the FTC concluded that cross-elasticities of production were a sufficient basis for concluding that the two report types should be included within one market.

■ It is well settled that cross-elasticity of supply is a valid basis for determining that two commodities should be within the same market. The court in Twin City Sportservice, Inc. v. Charles O. Finley & Co., supra, stated:

[T]he degree of substitutability in production is measured by cross-elasticity of supply. Substitutability in production refers to the ability of firms in a given line of commerce to turn their productive facilities toward another line because of similarities in technology between them. Where the degree of substitutability is high, cross-elasticities of supply would also be high, and again the two commodities should be treated as part of the same market. While the majority of the decided cases in which the rule of reasonable interchangeability is employed deal with the "use" side of the market, the courts have not been unaware of the importance of substitutability on the "production" side as well. Brown Shoe Co. v. United States, 370 U.S. 294, 325 n.42 [, 82 S.Ct. 1502, 1524 n.42, 8 L.Ed.2d 510] (1962).

Twin City Sportservice, 512 F.2d at 1271. The issue, therefore, becomes whether the FTC's finding that there was substantial cross-elasticity of supply was supported by the record.

The FTC's decision relied upon three basic facts as establishing supply cross-elasticity: (1) the use of similar techniques and technology in preparing both types of reports; (2) credit bureaus have in the past produced mortgage reports; and (3) Retailers has in the past produced credit reports, and has planned expansion into this area.

First, we find no substantial evidence of similar techniques or technology. The record is uncontested in demonstrating that

credit reports are telephonic or computerized reports of a person's bill-paying habits. A successful credit report business must have a great deal of current data readily available on a broad range of persons. Many credit report files are computerized. A customer, such as a department store, will typically call for a credit report on a prospective credit purchaser and will expect an alacritous response. The data base is usually provided by the customers themselves.

In contrast, mortgage reports are extensive written narratives exploring a person's character and financial assets. The reports are assembled from data collected during investigations which commence upon a customer's inquiry—rarely will there be file information on which a report can be based. Computerization is not helpful. A customer, such as a bank or other mortgage lender, will be interested in a thorough analysis of its prospective mortgagor's financial position and fiscal responsibility. The data base is collected on a case-by-case basis, and customers are not especially relied upon as sources of information. A comparison of the uncontroverted evidence relative to the assembly of the two report types clearly demonstrates that the techniques and technology of production are dissimilar.

Second, there is only insubstantial evidence to support the FTC's finding that credit bureaus generally produce mortgage reports. The evidence was that mortgage reports constitute *less than one percent* of the reports prepared by credit bureaus and that separate departments within the credit bureaus are usually responsible for their preparation.

Finally, we find no substantial evidence to support the FTC's conclusion that Retailers produced credit reports. The reports produced by Retailers, and cited by the FTC in support of its conclusion, were part of an experimental attempt in one Retailers' office designed to determine if reports based upon file information and termed "derogatory" reports, could be competitive substitutes for credit reports. Rather than reporting a purchaser's bill-paying habits, these reports provided any available derogatory information concerning the purchasers. Although purchased and utilized to some extent, the reports were not popular and were found to be inadequate substitutes for credit reports by those customers who purchased them. Retailers abandoned its experiment.

### III

We are unable to find relevant evidence on the record which is adequate to support the FTC's conclusion that there were substantial cross-elasticities in the production techniques and technologies of the two types of reports. The stated basis for the FTC's conclusion that Retailers and Equifax's credit bureau acquisitions operated within the same product market is therefore inadequate and we can unearth no other basis for reaching the same conclusion. Having therefore determined that there is no substantial evidence supporting the product market definition utilized by the ALJ and the FTC in establishing a section 7 violation by Equifax, we need reach no other issues presented by this appeal. The FTC did not sustain its burden of establishing that Equifax and its credit bureau acquisitions were operating within the same service market. Consequently, this necessary predicate to finding a section 7 violation is absent and the FTC's order finding such a violation must be vacated and this case remanded for further proceedings.

VACATED and REMANDED.