OLIN CORPORATION, Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 90–70452.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 11, 1991.

Decided Feb. 26, 1993.

Neal R. Stoll, Skadden, Arps, Slate, Meagher & Flom, New York City, for petitioner.

Joanne L. Levine, F.T.C., Washington, DC, for respondent.

Before: TANG, and TROTT, Circuit Judges, and RUDI M. BREWSTER,* District Judge.

TANG, Circuit Judge:

Olin Corporation ("Olin" or "Company") petitions for review of an order of the Federal Trade Commission ("Commission") to divest assets acquired from the FMC Corporation ("FMC") and used to produce swimming pool sanitizing chemicals. The Commission ruled that Olin's acquisition of these assets would likely result in a substantial lessening of competition in the relevant markets in violation of section seven of the Clayton Act, 15 U.S.C. § 18, and section five of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. We deny the petition for review.

## I.

This case concerns competition among manufacturers of swimming pool sanitizing agents, which are used to kill algae and bacteria. We focus on three such sanitizers; two are chemicals sold in dry form, and the third is liquid pool bleach (sodium hypochlorite). The case is mostly about the two dry sanitizers, "ISOS" (short for "isocyanurates," of which there are two varieties: "dichlor" and "trichlor") and, secondly, "CAL/HYPO" (short for calcium hypochlorite). A fourth chemical is also involved: "CA" (short for cyanuric acid). CA is a precursor in the manufacturing process of ISOS, and accounts for roughly 50% of the cost of ISOS production. CA is also used as a stabilizer in conjunction with the use of CAL/HYPO as a sanitizer.

Olin's dominance in the production and marketing of CAL/HYPO is not in question. Between 1980 and 1984, Olin's share of CAL/HYPO production in the United States ranged from 79% to 89%. This case arises out of Olin's attempts to expand its capabilities to produce and market ISOS.

In the late 1970s, Olin approved construction of a four-part facility in Lake Charles, Louisiana. Three parts of the facility were designed to manufacture CA and the two forms of ISOS, dichlor and trichlor. The fourth part was a packaging plant. Olin, however, encountered technical problems in making CA; this part of the Lake Charles plant was shut down in 1980, and written off the following year. Both the dichlor and the packaging facilities were shut down in 1982. The remaining part of the Lake Charles facility dedicated to trichlor production remained in operation until 1984, with Olin obtaining the CA necessary to make trichlor from Nissan, a Japanese producer of both CA and ISOS.

In 1984, Olin entered a "tolling agreement" with Monsanto Company whereby Olin would provide certain ISOS precursors to Monsanto. In return, Monsanto would produce ISOS and provide them to Olin. Olin thus became a "repackager" of ISOS. At the same time, Olin "waterbatched" its Lake Charles trichlor facility, keeping it in a state of readiness but not using it.

In early 1985, Olin entered an agreement with FMC to buy that company's swimming pool chemical business. The assets of that business included FMC's manufacturing plant for sanitizers located at South Charleston, West Virginia, and technical know-how for the production of CA. The South Charleston plant was composed of two production facilities, one each for ISOS and CA.[1]

The Commission began its challenge to the proposed acquisition in July 1985. To avoid an injunction against the acquisition, Olin agreed to maintain the acquired assets in a state which would permit divestiture in the event the Commission found the acquisition to be violative of the antitrust laws. Olin also agreed to a graduated withdrawal from its tolling agreement with Monsanto. As a result, the Commission permitted Olin

---

* Honorable Rudi M. Brewster, United States District Judge for the Southern District of California, sitting by designation.

1. Olin views the CA production facility as a separate asset for which a separate antitrust analysis should apply. However, as we discuss below, the proper perspective is to view the acquisition as a whole. Whether Olin should be allowed to keep the CA facility is a question we leave for consideration along with the appropriateness of the divestiture remedy ordered by the Commission.

and FMC to consummate their transaction in August 1985.

In the order from which Olin has petitioned, the Commission substantially adopted the decision of the administrative law judge, including the ALJ's conclusion that the acquisition would violate federal antitrust law because it would likely result in a substantial lessening of competition in the relevant markets. The Commission also adopted the ALJ's proposed remedy of divestiture. Thus, the Commission ordered Olin to divest itself of all pool sanitizer assets acquired from FMC, except for "the Sulfolane process technology and know-how for the manufacture of [CA]." Olin filed a timely petition for review of the Commission's decision and order.

Olin raises four contentions. First, the Company argues that the Commission's finding that ISOS and CAL/HYPO together constitute a relevant product market lacks substantial evidence. Olin also challenges on the same ground the Commission's finding that Olin's pre-acquisition share of the ISOS market did not substantially overstate Olin's significance as a competitor in the market for dry sanitizers. Third, Olin claims that the Commission's decision rejecting Olin's "exiting assets" defense is not supported by substantial evidence. Finally, the Company contends that the Commission's order to divest the South Charleston CA facility is not within its remedial discretion.

## II.

We review the Commission's findings of fact, including its economic conclusions, under the substantial evidence standard. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986) (*"Indiana Dentists"*) (review of factual findings under FTC Act); *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1384–85 (7th Cir.1986) (review of factual findings, including Commission's economic judgments, under Clayton Act), *cert. denied*, 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987); *RSR Corp. v. FTC*, 602 F.2d 1317, 1320, 1325 (9th Cir.1979) (review of factual findings, including Commission's economic judgment, under FTC Act), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980); *see* 15 U.S.C. §§ 21(c), 45(c). Under this standard, "the court must accept the Commission's findings of fact if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Indiana Dentists*, 476 U.S. at 454, 106 S.Ct. at 2015 (quotation omitted).

The legal issues presented—that is, the identification of governing legal standards and their application to the facts found—are, by contrast, for the courts to resolve, although even in considering such issues the courts are to give some deference to the Commission's informed judgment that a particular commercial practice is to be condemned as "unfair." *Id.*

## III.

Normally, "a delineation of proper geographic and product markets is a necessary precondition to assessment of the probabilities of a substantial effect on competition within them." *United States v. General Dynamics Corp.*, 415 U.S. 486, 510, 94 S.Ct. 1186, 1200, 39 L.Ed.2d 530 (1974); *accord Equifax, Inc. v. FTC*, 618 F.2d 63, 66 (9th Cir.1980). There is no dispute in this case that the geographic market relevant to this case is the entire United States. The parties have further stipulated that one relevant United States product market consists solely of ISOS (the "ISOS-only" market). The Commission also identified over Olin's objection a second relevant United States product market, one comprised of both ISOS and CAL/HYPO (the "dry sanitizers" market).

## A.

Olin attacks the finding of a dry sanitizers market for two related reasons. First, in concluding that Olin's acquisition of FMC assets would likely have an anticompetitive effect, the Commission examined *in part* the acquisition's effect on the dry sanitizers market. Olin contends that the finding of likely anticompetitive effect is

erroneous because it is premised on the existence of a relevant dry sanitizers market and because this market's existence is not supported by substantial evidence. Even if Olin were correct in this assertion, however, the Commission also looked to the acquisition's effect on the ISOS-only market in finding a violation of the antitrust laws. The Commission did not state whether its ultimate conclusion concerning likely anticompetitive effect was dependent on analyses of both product markets, or on the analysis of one or the other. The Commission's finding of likely anticompetitive effect therefore might still be upheld based on the analysis of the ISOS-only market even if the finding of a dry sanitizers market is not supported by substantial evidence. The importance of Olin's challenge to the dry sanitizers market is thus questionable.[2]

The second reason for Olin's attack on the identification of a relevant dry sanitizers market concerns the decision in *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). In *General Dynamics*, the Supreme Court held that under certain circumstances market share can overstate competitive ability. *Id.* at 501–03, 94 S.Ct. at 1195–97. Relying on *General Dynamics*, Olin argues that the Commission erred in using Olin's pre-acquisition share of the ISOS-only market to assess the acquisition's effect on competition. Olin contends this was error because its ISOS business was not viable before the acquisition.

Based on certain language appearing in the Commission's opinion, it appears the Commission may have considered Olin's pre-acquisition ISOS business *only* in assessing the acquisition's effect on the dry sanitizers market, and not in regard to the ISOS-only market. The language is as follows:

*The relevant market is dry sanitizers*, rather than just [ISOS], and Olin was the number one producer in capacity and output in the market *for dry sanitizers* solely on the basis of its [CAL/HYPO] production. Nonetheless, because Olin's lead *in dry sanitizers* over the second largest domestic producer would be diminished if its [ISOS] capacity and output were excluded from the analysis of the market shares, the viability of Olin's [ISOS] business is significant in assessing its preacquisition market position.

(Emphasis added.) Thus, if the Commission erred in finding a relevant dry sanitizers market (as Olin contends), it becomes arguable that the Commission committed a fatal mistake in not considering the viability of Olin's pre-acquisition ISOS business before assessing the acquisition's effect in regard to the ISOS-only market.

Bearing in mind Olin's two reasons for attacking the Commission's finding of a relevant market in dry sanitizers, we turn to the basis for this finding, and to Olin's challenges.

### B.

We recently described the process of product market definition as follows:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 [82 S.Ct. 1502, 1524, 8 L.Ed.2d 510] (1962) (footnote omitted). Where an increase in the price of one product leads to an increase in demand for another, both products should be included in the relevant product market.

*California v. American Stores Co.*, 872 F.2d 837, 841 (9th Cir.1989) (citation modi-

---

**2.** One apparent flaw in the Commission's analysis of the *ISOS-only market* lies in its conclusion that "[t]he level of concentration in the [ISOS]-only market proposed by Olin is ... very high." In coming to this conclusion, the Commission did not provide any discussion similar to its analysis of the *dry sanitizers market.* In analyzing the post-acquisition *dry sanitizers market,* the Commission concluded that Olin's produc-

tion capacity would be 57% of a market in which the "four-firm concentration ratio" was 95%. Nevertheless, there is evidence supporting the Commission's conclusion regarding likely anti-competitive effect on the ISOS-only market. It appears that Olin's post-acquisition share of production capacity in an ISOS-only market would be 48%, with a "four-firm concentration ratio" of 99.7%.

fied), *rev'd on other grounds,* 495 U.S. 271, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990), *reinstated in relevant part,* 930 F.2d 776, 777 (9th Cir.1991); *accord RSR Corp. v. FTC,* 602 F.2d 1317, 1320 (9th Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980). Recognizing that, on the one hand, a change in one product's price has some infinitesimal effect on demand for every other product and, on the other hand, that products need not be fungible to be considered in the same market, the Supreme Court has cautioned that, "[i]n defining the product market between these terminal extremes, we must recognize meaningful competition where it is found to exist." *United States v. Continental Can Co.,* 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964).

Within one market there may exist additional submarkets relevant for antitrust purposes. *RSR Corp.,* 602 F.2d at 1320. The boundaries of such markets are determined " 'by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.' " *RSR Corp.,* 602 F.2d at 1320–21 (quoting *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524). Because every market that encompasses less than all products is, in a sense, a submarket, these factors are relevant even in determining the primary market to be analyzed for antitrust purposes. *See Continental Can Co.,* 378 U.S. at 449, 453–55, 84 S.Ct. at 1743, 1745–46.

To aid in product market definition, the Department of Justice has promulgated the "five-percent test." *See* United States Department of Justice, *Merger Guidelines— 1984* (introductory statement), *reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,103, at 20551. Because this test is key to understanding many of Olin's arguments, we set out the Justice Department's description of the test:

> In general, the Department will include in the product market a group of products such that a hypothetical firm that was the only present and future seller of those products ("monopolist") could *profitably* impose a "small but significant and nontransitory" increase in price. That is, assuming that buyers could respond to an increase in price for a tentatively identified product group only by shifting to other products, what would happen? If readily available alternatives were, in the aggregate, sufficiently attractive to enough buyers, an attempt to raise price would not prove profitable, and the tentatively identified product group would prove to be too narrow.
>
> [More s]pecifically, the Department will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed a "small but significant and nontransitory" increase in price. If the price increase would cause so many buyers to shift to other products that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Department will add to the product group the product that is the next-best substitute for the merging firm's product and ask the same question again. This process will continue until a group of products is identified for which a hypothetical monopolist *could profitably* impose a "small but significant and nontransitory" increase in price. *The Department generally will consider the relevant product market to be the smallest group of products that satisfies this test.*
>
> . . . .
>
> . . . In attempting to determine objectively the effect of a "small but significant and nontransitory" increase in price, the Department in most contexts will use a price increase of *five percent* lasting one year. However, what constitutes a "small but significant and nontransitory" increase in price will depend on the nature of the industry, and *the Department at times may use a price increase that is larger or smaller than five percent.*[7]

---

[7] For example, a larger increase may be appropriate[ ] if the "price" to be increased is a

tariff or commission that constitutes a small fraction of the price of the product being transported or sold.

*Id.* § 2.11 (selected footnotes omitted) (emphasis added), *reprinted in* 4 Trade Reg. Rep. (CCH) ¶ 13,103, at 20556–57. To aid in applying this test, the Justice Department has indicated some of the circumstantial evidence relevant in assessing the likely effect of a price increase, given that it is "usually necessary" to infer such effects because direct evidence is not always available. *Id., reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,103, at 20557.[3]

■ In 1982, when the Department of Justice first announced the five-percent test, the Attorney General noted that the Merger Guidelines merely serve the purpose of determining what mergers the department will challenge. United States Department of Justice, *Merger Guidelines—1982* (Explanation and Summary), *reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,102, at 20,528.

> The Attorney General emphasized that the guidelines are not a comprehensive statement of the circumstances considered by the Department in determining whether to challenge a merger. [Rather, t]heir purpose is to provide guidance to the business community, private lawyers and others in anticipating what standards will be used and how they will be applied.

*Id., reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,102, at 20,528. Certainly the Guide-

lines are not binding on the courts, *see FTC v. PPG Indus.*, 798 F.2d 1500, 1503 n. 4 (D.C.Cir.1986), or, for that matter, on the Commission.[4]

■ In conducting its product market analysis for swimming pool sanitizers, the Commission discussed physical composition, usage, and technical characteristics of dry sanitizers. At the outset, the Commission observed that similarities in these categories "predominate over the minor [physical] differences" between ISOS and CAL/HYPO. The following facts are particularly important: (1) Both products are used to deliver chlorine to swimming pools; (2) each product is able to deliver chlorine with about the same efficiency—although a pool chlorinated with ISOS will remain chlorinated longer; (3) by virtue of both products' stability and other characteristics, "a pool owner can purchase a year's supply of either [product] in a single trip to the store"; and (4) both products are available to consumers in the same forms.[5]

Despite these similarities, however, ISOS are perceived as more convenient than CAL/HYPO because, once applied, ISOS last longer than CAL/HYPO, and because CAL/HYPO requires use of a separate stabilizer (i.e., CA). Recognizing that the "convenience of [ISOS] is reflected in a price premium that [ISOS] maintain over [CAL/HYPO]," the Commission then analyzed whether this premium is sufficient to prevent inclusion of ISOS and CAL/HYPO in the same market. *Cf. United States v.*

---

3. Since this case was submitted, the Justice Department and the Commission have jointly revised their merger guidelines. *See* Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* (Apr.1992), *reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,104. This revision has not substantially changed the five-percent test as it applies in this case. *Compare id.* § 1.1, *reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,104, at 20,572–73 *with* United States Department of Justice, *Merger Guidelines—1984* § 2.11, *reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,103, at .20556–57. *See generally* 4 Trade Reg.Rep. (CCH) ¶ 13,-104, at 20,569.

4. In 1982, the Commission issued its first set of merger guidelines. The stated purpose for doing so was "to express its collective judgment of the reasons why it supports changes in the 1968 [DOJ] Guidelines and to highlight the principal

considerations that will guide its horizontal merger enforcement." *FTC Statement Concerning Horizontal Mergers* pt. I (1982), *reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,200, at 20,901. The Commission guidelines did not refer to the five-percent test, though they did indicate that "the Department of Justice's 1982 revisions to the 1968 Guidelines will be given considerable weight by the Commission." *Id., reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,200, at 20,901. Of course, the Commission has now embraced the five-percent test. *See supra* note 3.

5. In discussing these characteristics, the Commission apparently assumed that the relevant market is defined in terms of consumers who maintain their own pools. Although Olin challenges this assumption, we conclude there is substantial evidence in support of dealing with residential consumers as a distinct market.

*Aluminum Co. of Am.*, 377 U.S. 271, 276, 84 S.Ct. 1283, 1287, 12 L.Ed.2d 314 (1964) ("to ignore price in determining the relevant line of commerce [when products stand distinctly apart pricewise] is to ignore the single, most important, practical factor in the business"). Ultimately, the Commission concluded that "[a]fter the price spread between [CAL/HYPO] and [ISOS] narrowed, Olin could not profitably impose a small but significant and nontransitory increase in the price of [CAL/HYPO] because of the danger that consumers would then switch to [ISOS]." Given this indication of cross-elasticity of demand, the Commission concluded that ISOS and CAL/HYPO together compose a relevant product market (i.e., the dry sanitizers market).

Olin attacks this conclusion on three grounds: (1) the existence of a relevant ISOS-only market precludes the existence of a dry sanitizers market; (2) the Commission's cross-elasticity analysis is faulty and lacks substantial evidence; and (3) the Commission erred in excluding liquid pool bleach from a market that includes both ISOS and CAL/HYPO.

### 1. Legal Effect of Recognizing an ISOS–Only Market

Olin argues that it is inconsistent to recognize a larger, dry sanitizers market once a relevant ISOS-only market has been identified. While this may be true under the Department of Justice Merger Guidelines, it is not true as a matter of federal antitrust law.

By stating that "[ISOS] buyers, when faced with a small but significant and nontransitory price increase, would not shift to [CAL/HYPO] in sufficient numbers to make the increase *unprofitable*," the Commission essentially states that ISOS compose a relevant market under the Merger Guidelines. Because the Guidelines also indicate that "[t]he Department generally will consider the relevant product market to be the smallest group of products that satisfies [the five-percent] test," it may be contradictory under the Department's guidelines to define a second relevant market as including both ISOS and CAL/HYPO.

However, relevant submarkets are common in merger analysis. *See RSR Corp.*, 602 F.2d at 1320 ("well-defined submarkets may also exist which, in themselves, can constitute product markets for antitrust purposes"). Recognizing ISOS as a submarket of the dry sanitizers market is not inherently contradictory with recognizing a dry sanitizers market. *See also United States v. Aluminum Co. of Am.*, 377 U.S. 271, 274–77, 84 S.Ct. 1283, 1285–87, 12 L.Ed.2d 314 (1964) (finding a broader market composed of bare and insulated aluminum conductor products after parties had agreed to, and district court found, a relevant market in bare aluminum conductor alone).

### 2. Cross–Elasticity Between ISOS and CAL/HYPO

Olin charges that the Commission had no basis on which to conclude that any significant degree of elasticity existed between ISOS and CAL/HYPO. Specifically, Olin makes two arguments: (a) that the Commission misunderstood the Merger Guidelines "five-percent test," and (b) that the Commission's inferences concerning cross-elasticity were not supported by substantial evidence.

#### a. The Five Percent Test

In order for a dry sanitizers market to be recognized as "relevant" under a typical application of the Department of Justice Merger Guidelines, a 5% increase in the price of CAL/HYPO must cause enough CAL/HYPO consumers to switch to ISOS to make the price increase unprofitable for the hypothetical CAL/HYPO monopolist. The Guidelines suggest that the time period within which the switch must occur is one year. *See* United States Department of Justice, *Merger Guidelines–1984* § 2.11, *reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,-103, at 20557.

Olin argues that, in order to find cross-elasticity, it was necessary for the Commission to do two things: first, to ignore the allegedly artificial nature of an established

narrowing in the price gap between the two products before applying the hypothetical 5% increase and, second, to extend the time period in which the switch between products would be measured.

It is evident from its opinion that the Commission relied on a narrowing of the price gap between the two products in determining cross-elasticity. The opinion described this narrowing as follows: "During the period from 1977 to 1983, ... the price of [CAL/HYPO] increased at a faster rate than that of [ISOS]."[6] According to the opinion, this increase in the price of CAL/HYPO came about *despite* direct competition from Japanese CAL/HYPO, which was later the subject of an "antidumping" order.

Olin argues that the narrowing of the price gap between CAL/HYPO and ISOS was artificial—and should not be included in determining cross-elasticity—because the Japanese were "dumping" ISOS on the American market. The Commission responds convincingly that, because CAL/HYPO was subject to the same pressures as the result of Japanese CAL/HYPO dumping, the narrowing in price was not artificial. Olin ignores this explanation and shifts its focus to the Commission's concession that CAL/HYPO consumers would not switch to ISOS until the price of CAL/HYPO had risen at least 10%.

Despite Olin's attempt to emphasize the 5% factor normally used by the Department of Justice, research has not disclosed a case that mandates this percentage, let alone one that requires that the courts employ the Department of Justice methodology for determining relevant product markets. Indeed, the Department of Justice itself acknowledges that a higher percent increase in price is appropriate in determining the relevant product market in certain cases. *See* United States Department of Justice, *Merger Guidelines—1984* § 2.11 n. 7 & accompanying text, *reprinted in* 4 Trade Reg.Rep. (CCH) ¶ 13,103, at 20557. Thus, a finding of cross-elasticity between ISOS and CAL/HYPO is not precluded by the fact that a higher price increase is necessary to induce a switch; a higher increase indicates only that the relationship between the two products is somewhat inelastic—but not necessarily so inelastic as to exclude the products from the same market, particularly under the substantial evidence standard of review.

Olin's other challenge to the Commission's application of the Merger Guidelines is that the Commission looked at too long a period of time in assessing whether consumers would switch products after a price increase. We find this argument unpersuasive in view of the Commission's response that it made its determination with regard to consumer reaction over a one year period and the Supreme Court's statement that competitiveness over the long-run can be important, even when "interchangeability of use may not be so complete and the cross-elasticity of demand not so immediate." *United States v. Continental Can*

6. The Commission has provided the following table:

| | PRICE PER POUND | | | SHARE OF PRIMARY USAGE | | |
|---|---|---|---|---|---|---|
| | ISO'S* | HTH** | HTH/ISO'S | ISO'S | HTH | HTH/ISO'S |
| 1977 | $1.04 | .57 | 55% | 41% | 42% | 102% |
| 1978 | 1.13 | .62 | 55% | 41% | 42% | 102% |
| 1979 | 1.17 | .63 | 54% | 42% | 42% | 100% |
| 1980 | 1.15 | .76 | 66% | 45% | 39% | 87% |
| 1981 | 1.15 | .88 | 77% | 49% | 34% | 69% |
| 1982 | 1.20 | .98 | 83% | 54% | 29% | 54% |
| 1983 | 1.20 | .98 | 83% | N/A | N/A | N/A |

*PRICE TO REPACKER; **CARLOAD PRICE TO HTH DISTRIBUTOR

"HTH," referred to in the chart, is Olin's brand of CAL/HYPO. The chart shows that, over time, as the price of CAL/HYPO increased relative to ISOS, more and more people switched to ISOS. Olin disputes whether this is truly evidence of cross-elasticity, in view of the fact that the Japanese were dumping ISOS on the American market, and that the switch from CAL/HYPO to ISOS occurred over several years.

*Co.*, 378 U.S. 441, 455, 84 S.Ct. 1738, 1746, 12 L.Ed.2d 953 (1964).

### b. Supporting Evidence

Olin also attacks the two pieces of circumstantial evidence on which the Commission relied in finding cross-elasticity of demand between ISOS and CAL/HYPO: a statement Olin made to the International Trade Commission ("ITC"), and a statement made by an Olin competitor indicating a competitive relationship between CAL/HYPO and ISOS.

Specifically, the Commission relied in part on the following statement made by Olin to the ITC in the course of trying to combat Japanese imports of CAL/HYPO:

> We recognize that the domestic [CAL/HYPO] industry faces increased competition from other pool chemical products, particularly from [ISOS]. [ISOS], however, traditionally have been priced substantially above [CAL/HYPO] products. As the price of [ISOS] dropped in recent years, in large part due to Japanese dumping of that product, some consumers have chosen to purchase that product instead of either domestic or foreign-made [CAL/HYPO].

Olin argues that this statement indicates only that Japanese dumping of ISOS was responsible for the narrowing of the price gap between ISOS and CAL/HYPO and, because this narrowing was artificial, the statement says nothing about the competitive relationship between the two products. However, as previously mentioned, the fact that CAL/HYPO was also dumped on the market indicates that other factors may have been at work in reducing the price gap between the products. Indeed, Olin's statement implicitly acknowledges that other factors played at least some part in reducing the gap. The Commission thus could have relied on this statement to provide some support for its conclusion that

ISOS and CAL/HYPO were in the same market.[7]

The other piece of evidence attacked by Olin is a statement of Olin's CAL/HYPO competitor, PPG: "Consumption of [CAL/HYPO] as a swimming pool sanitizer can be affected by [ISOS] consumption." Olin again charges that such statements are irrelevant because they say nothing about whether "[ISOS] demand can be affected by *small price increases* in [CAL/HYPO] over a short period of time," and because such statements are based on the supposedly artificial effect induced by Japanese ISOS dumping. For the previously stated reasons, these arguments are not persuasive.

Finally, Olin argues that even if the PPG statement indicates that the swimming pool sanitizer industry recognized a competitive relationship between ISOS and CAL/HYPO, the Commission failed to cite evidence that pricing decisions were made based upon this relationship. The Commission, however, did cite evidence indicating that business decisions were based on the recognized relationship. Indeed, Olin's own business decisions were based in part on the goal of maintaining the price relationship between CAL/HYPO and ISOS. From this goal, it can easily be inferred that pricing decisions were based on the competitive relationship between the two products.

In sum, we find adequate support for the Commission's finding of cross-elasticity between ISOS and CAL/HYPO.

### 3. Exclusion of Liquid Pool Bleach

Finally, Olin attacks the exclusion of liquid pool bleach from a market composed of ISOS and CAL/HYPO. Olin essentially argues that the only rational basis for including CAL/HYPO and ISOS in the same market is that both products are used to sanitize swimming pools. If this is the determinative criterion, Olin continues, then liq-

---

**7.** It appears that the Commission regards the narrowing in the price gap as indicative of what would happen in a truly competitive market. Olin, on the other hand, argues that the reduced gap in price was artificial and that, once dumping was stopped in 1984, the gap widened to its "traditional" level. Whether the competitive effects of the antidumping orders can be accurately assessed, however, is uncertain given that the acquisition here in question was arranged within a year of the antidumping orders, and was consummated soon thereafter.

uid pool bleach must also be included in the relevant market.[8]

Even accepting Olin's argument that there is a relevant market comprised of all pool sanitizers, this does not preclude identification of a relevant submarket comprised solely of dry sanitizers. *See, e.g., Continental Can,* 378 U.S. at 457–58, 84 S.Ct. at 1747–48; *RSR Corp.,* 602 F.2d at 1320 ("well-defined submarkets may also exist which, in themselves, can constitute product markets for antitrust purposes"). The remaining question is whether the Commission considered relevant and substantiated factors in delineating a dry sanitizers submarket.

As stated previously, " 'practical indicia [such] as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors,' " *RSR Corp.,* 602 F.2d at 1320–21 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962)), are to be considered in determining whether a relevant submarket exists for antitrust purposes.

The Commission cites several plausible reasons to separate liquid pool bleach from the dry sanitizers in defining a relevant market: Most pool bleach is consumed in discrete geographic regions; liquid pool bleach is inconvenient because a season's worth cannot be bought in one trip to the store, and because bleach spills can damage clothing and car interiors; liquid bleach is less expensive than dry sanitizers; and liquid pool bleach is sold predominately to pool service companies rather than to those who maintain their pools themselves.

The Commission also discussed cross-elasticity of demand between dry sanitizers and liquid pool bleach, concluding that "circumstantial evidence indicates a low degree of substitution between dry and liquid sanitizers." Based on the foregoing, the Commission was justified in identifying a rele-vant dry sanitizers submarket which excluded liquid pool bleach.

### 4. Conclusion

Having considered the parties' arguments, we conclude that there is substantial evidence on which the Commission could base its identification of a relevant "dry sanitizers" market composed of ISOS and CAL/HYPO.

### IV.

■ The decision in *United States v. General Dynamics Corp.,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), emphasizes that market shares may not disclose the true competitive ability of a firm. In *General Dynamics,* the government challenged the acquisition of United Electric Coal Companies by Material Services Corporation (which, in turn, was later acquired by General Dynamics Corporation). *Id.* at 489–90, 94 S.Ct. at 1190–91. The government charged that, based on market share, the United Electric acquisition substantially lessened competition in the production and sale of coal. *Id.* at 490, 494–96, 94 S.Ct. at 1190, 1192–93. The Court disagreed, concluding that, while the merger did result in an entity possessing a suspect market share, *id.* at 496, 497–98, 94 S.Ct. at 1193, 1193–94, the acquisition could not substantially lessen competition because United Electric was virtually unable to compete in the present-day market, *id.* at 502–03, 94 S.Ct. at 1196. Although it was producing coal, the company was "facing the future with relatively depleted resources at its disposal, and with the vast majority of those resources already committed under contracts allowing no further adjustment in price." *Id.* at 503, 94 S.Ct. at 1197. "[I]ts current and future power to compete for subsequent long-term contracts was severely limited by its scarce uncommitted resources." *Id.* (footnote omitted).

Based on the *General Dynamics* case, Olin argued to the Commission that the Company's pre-acquisition share ·of the

---

8. Olin's efforts to include liquid pool bleach in the relevant product market are intended to undermine the Commission's reliance on a dry sanitizers market in ordering divestiture.

ISOS market was not indicative of market power because Olin's pre-acquisition ISOS business was not viable. As Olin has emphasized, the Commission accepted this argument as relevant, even though the largest components of Olin's post-acquisition share of the dry sanitizers market would be Olin's pre-acquisition CAL/HYPO business, and FMC's pre-acquisition ISOS business.[9] Thus, the Commission undertook to decide whether in fact Olin's pre-acquisition ISOS business was "non-viable" in some manner analogous to the United Electric business acquired in *General Dynamics*. The Commission concluded that no such analogy applied.

Initially, Olin argues that the Commission improperly shifted the burden of proof in determining whether Olin's pre-acquisition ISOS business was viable. Olin's sole basis for this argument is language appearing in the Commission's opinion such as: "Olin has not made a persuasive showing" and "Olin has not pointed to solid evidence" in support of its viability argument. This is hardly solid ground on which to argue the Commission unfairly saddled Olin with an impermissible burden.

Nevertheless, in support of its argument, Olin cites *United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C.Cir.1990) (Thomas, J.), in which the government brought an action under section seven of the Clayton Act based on a merger of drilling rig companies. *See id.* at 982. After the government established a prima facie case of probable anticompetitive effect based on statistical evidence of market share, the defendants successfully rebutted the government's showing, apparently by introducing sufficient evidence that the market was easily entered. *Id.* at 983.[10] In response,

"[t]he government did not produce any additional evidence showing a probability of substantially lessened competition, and thus failed to carry its ultimate burden of persuasion." *Id.* On appeal, the government argued that the district court erred in allowing the defendants to rebut the prima facie case by less than a "clear showing." *Id.* (emphasis added).[11] The court rejected this argument.

The clearest reason why *Baker Hughes* does not control here is that the Commission responded to the Company's rebuttal, whereas in *Baker Hughes* the government did not. *Cf. id.* at 983. In the present case, the Commission pointed to evidence indicating why Olin's viability argument should fail. The Commission is able to do this because it is Olin's burden to rebut a prima facie case of illegality. *See California v. American Stores Co.*, 872 F.2d 837, 842 (9th Cir.1989), *rev'd on other grounds*, 495 U.S. 271, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990), *reinstated in relevant part*, 930 F.2d 776, 777 (9th Cir.1991). In any event, whether the Commission applied an incorrect standard in assessing the rebuttal is difficult to say; certainly the Commission is not seeking to have this court adopt a higher standard, as the government was in *Baker Hughes*.

As a preface to discussing Olin's remaining "viability" arguments, we observe that the essence of the *General Dynamics* decision is that, as the result of certain circumstances, the "current and future power" of the acquired company—United Electric— "to compete for subsequent long-term contracts was severely limited by its scarce uncommitted resources." 415 U.S. at 503, 94 S.Ct. at 1197. At the heart of the

---

**9.** On appeal, the Commission argues that, even if Olin's pre-acquisition ISOS market share is excluded from the analysis of the dry sanitizers market and only its pre-acquisition CAL/HYPO business and FMC's pre-acquisition ISOS business are considered, the merger would still violate federal antitrust law. Although the ALJ apparently agreed, the Commission did not explicitly consider this argument in its opinion. Therefore, we will not review it here.

**10.** Ease of market entry is relevant in antitrust cases because even a monopolist will not be

able to exercise power over price in a market that is easily entered by potential competitors. The assumption is that, in an easily entered market, an artificial increase in price will entice bystanders to enter the market, eventually restoring competitive conditions.

**11.** Interestingly, as in the present case, the lower tribunal in *Baker Hughes* did not explicitly indicate what standard it had applied in assessing the defendants' rebuttal. *See* 908 F.2d at 983.

Commission's decision rejecting Olin's viability argument is the belief that Olin's pre-acquisition ISOS business was *not* in a position analogous to United Electric's. The best reason for this belief is evidence that Olin was able to obtain as much CA as it wished from Nissan. Olin's arguments that this supply was flawed because its price was not competitively determined are not plausible in view of Olin's past ability to obtain price concessions from Nissan and Olin's eventual decision to opt for an even more expensive arrangement by having Monsanto supply Olin as a "repackager" of ISOS. Olin's resources do not appear to be limited in a manner which made it an ineffective ISOS competitor prior to the acquisition of the FMC assets.

Olin also challenges on three other grounds the Commission's finding that the Company's pre-acquisition ISOS business was viable and should be included in determining the acquisition's effect on competition.

Olin first argues that the viability of its pre-acquisition ISOS business depends on its ability to manufacture for itself the ISOS precursor, CA (i.e., cyanuric acid). The one case to which Olin cites for this proposition, *B.F. Goodrich Co.*, 110 F.T.C. 207 (1988), in no way supports the Company's argument. As the Commission points out, and as Olin concedes, the Company relies not on a holding of the Commission, but on a party's argument which, Olin contends, the Commission endorsed. Even so, the argument presented in *B.F. Goodrich* does not help Olin because it dealt with the question whether a precursor chemical, such as CA, could be considered as a relevant market when a separate market for the industry's end-product fully reflected the competitive relationships existing among industry participants. The present case is obviously not concerned with whether CA could compose a relevant market, or whether Olin's acquisition would impact that market.

Olin's next argument is that it is inconsistent for the Commission to conclude that the Company's pre-acquisition ISOS business was viable without a captive CA sup-

ply and, at the same time, to order divestiture of the South Charleston CA plant, together with an ISOS plant, on the ground that the CA plant is necessary "to ensure the viability of the divested entity." The key word here, however, is "ensure"; the Commission did not conclude that a captive CA supply was essential to viability. Nor did the Commission conclude a captive CA supply was essential, as Olin suggests, when the Commission remarked that Olin's efforts to secure a source of CA indicated that entry into the ISOS market was difficult.

Olin's final contention here is somewhat more obscure. The Company emphasizes its technical problems in developing CA production and mentions its alleged financial difficulties. However, Olin later disclaims any argument that the weakened financial condition of its pre-acquisition ISOS business is relevant. The argument thus boils down to Olin's technological abilities. Having concluded that a captive source of CA is not essential to a viable ISOS business, we find Olin's arguments concerning its ability to produce CA unpersuasive. The one decision on which Olin relies is equally unavailing.

In *United States v. Consolidated Foods Corp.*, 455 F.Supp. 108, 136–37 & n. 19 (E.D.Pa.1978), the court focused on technical difficulties affecting the quality of the product ultimately brought to market. Olin, however, asks us to look at technological problems affecting one means of producing the marketed product—a means for which Olin found alternatives in the forms of Nissan CA and, later, Monsanto ISOS. We decline the invitation to extend the *Consolidated Foods* analysis to the present case. Instead, we conclude the Commission was justified in its decision to include Olin's pre-acquisition ISOS business in determining the probability of anticompetitive effects stemming from Olin's acquisition of FMC ISOS assets.

## V.

The Supreme Court has recognized a "failing company" defense to anticompetitive mergers. "A company invoking the

defense has the burden of showing that its 'resources [were] so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure . . .,' *International Shoe Co. v. FTC*, 280 U.S. 291, 302 [50 S.Ct. 89, 93, 74 L.Ed. 431] (1930), and further that it tried and failed to merge with a company other than the acquiring one." *United States v. General Dynamics Corp.*, 415 U.S. 486, 507, 94 S.Ct. 1186, 1198, 39 L.Ed.2d 530 (1974) (footnote omitted; citations modified and omitted). There is no dispute in this case that FMC's ISOS business was successful, although it may not have met the company's expectations. Olin therefore cannot rely on a "failing company" defense.

Instead, Olin advances a novel "exiting assets" defense. "The key element of such a defense is proof that, without the merger, the assets owned by the acquired firm would *shortly* be leaving the market." John E. Kwoka, Jr. & Frederick R. Warren-Boulton, *Efficiencies, Failing Firms, and Alternatives to Merger: A Policy Synthesis*, 31 Antitrust Bull. 431, 446 (1986) (emphasis added). The Commission indicated that it was not inclined to recognize this defense; nevertheless the Commission reviewed Olin's factual arguments. The burden of proof is undoubtedly on Olin to establish any such defense. *Cf. General Dynamics*, 415 U.S. at 507, 94 S.Ct. at 1198.

Regarding Olin's defense, the Commission concluded as follows:

> [T]he evidence does not establish that FMC made the decision to close [its ISOS] business in the near future. Quite the contrary, the record indicates that FMC's management continued to operate the facility in the expectation that the facility could at some point be sold. In addition, the record does not contain evidence that FMC's management had conducted an exhaustive effort to sell the package of assets sold to Olin. The record contains no indication that no less anticompetitive alternative to the merger is available.

On appeal, Olin attacks only the second finding: the existence of less anticompetitive alternatives. Yet the first finding— that the assets would not be exiting the relevant market "shortly"—is sufficient to sustain the Commission's ruling that Olin did not establish an "exiting assets" defense. This finding is supported by substantial evidence.

## VI.

Olin concedes that the Commission has broad discretion to cope with any unlawful practices disclosed by the record, but argues that the Commission's order that Olin divest the South Charleston CA facility acquired from FMC is not reasonably related to the unlawful practice found here. The Commission, however, reasoned that the CA facility must be divested together with a related ISOS facility in order to ensure the viability of the divested entity as an ISOS producer. This reasoning is consistent with the Commission's conclusion that entry into the ISOS market is difficult without a captive supply of CA.

Furthermore, as the Commission pointed out, there is no indication that FMC would have sold its CA plant apart from the rest of its ISOS assets. Olin does not dispute this, nor does the Company point to evidence that the two facilities, which are located at the same plant, can be separated in the manner suggested by Olin. The divestiture remedy ordered by the Commission is thus within the range of properly exercised discretion.

## VII.

The petition for review is DENIED.