**The BON–TON STORES, INC., Plaintiff,**

**v.**

**The MAY DEPARTMENT STORES COMPANY, McCurdy & Company, Inc., and Wilmorite, Inc., Defendants.**

**STATE OF NEW YORK By G. Oliver KOPPELL, Attorney General, Plaintiff,**

**v.**

**The MAY DEPARTMENT STORES COMPANY, McCurdy & Company, Inc., and Wilmorite, Inc., Defendants.**

**Nos. 94–CV–6454L, 94–CV–6479L.**

United States District Court, W.D. New York.

Nov. 30, 1994.

James Metzler, Boylan, Brown, Code, Fowler, Randall & Wilson, Rochester, NY, Ray S. Bolze, Marc G. Schildkraut, Yvette Benguerel, Eberhard W. Pfaller, Jr., Howrey and Simon, Washington, DC, for The Bon–Ton Stores, Inc.

Joseph Opper, Robert Hubbard, Pamela Jones Harbour, New York State Dept. of Law, Antitrust Bureau, New York City, for State of NY, by G. Oliver Koppell.

Anthony R. Palermo, Hodgson, Russ, Andrews, Woods & Goodyear, Rochester, NY, Ronald J. Dolan, Gary P. Chura, St. Louis, MO, for The May Dept. Stores Co.

Fred G. Aten, Jr., Harter, Secrest & Emery, Rochester, NY, for McCurdy & Co., Inc.

Paul R. Braunsdorf, Harris, Beach & Wilcox, Rochester, NY, for Wilmorite, Inc.

## DECISION AND ORDER

LARIMER, District Judge.

### FACTUAL BACKGROUND

In our economic system, mercantile enterprises are generally left to their own devices to determine how best to make a profit. Certain actions, or inactions, purportedly designed to enhance profits may instead have a potential to harm the public. In such a case, swift action by a governmental agency or a court is necessary to avoid harm both to individuals and to the general public.

This is such a case. The attempt by a large retail company to purchase all of the assets of its principal competitor, effectively blocking other like competitors from entering the market, will have serious adverse economic effects in the greater Rochester metropolitan area. Whenever competition is substantially reduced, consumers suffer. Lack of choices and higher prices are almost inevitable. In such a circumstance the public interest controls and the acquisition must be vacated and annulled.

Plaintiffs The Bon–Ton Stores, Inc. ("Bon–Ton") and the State of New York ("the State") commenced these consolidated actions against defendants, May Department Stores Company ("May"), McCurdy & Company, Inc. ("McCurdy's"), and Wilmorite, Inc. ("Wilmorite"), to enjoin the sale of eight McCurdy-owned department stores in the greater Rochester, New York area to May. May presently owns four stores in the area doing business as Kaufmann's.

Plaintiffs allege that the sale violates both federal and state antitrust laws, specifically Section 7 of the Clayton Act, 15 U.S.C. § 18, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 340 of the New York General Business Law. Bon–Ton seeks an injunction enjoining defendants from concluding and closing on an agreement between McCurdy's and May by which May would acquire the McCurdy's stores in the Rochester area. Bon–Ton also seeks damages as well as costs and attorneys' fees. The State also seeks to block the sale and also seeks civil penalties, costs and attorneys' fees.

There are several motions pending before the Court. Bon–Ton and the State have moved for a preliminary injunction and all defendants have moved to dismiss the complaints.

Bon–Ton had sought a temporary restraining order at the time the complaint was filed because closing on the purchase agreement between May and McCurdy's was imminent. In lieu of a hearing on the temporary restraining order application, the parties stipulated that May would maintain three of the acquired stores in the major regional malls, as is, at least until November 1, 1994. Wilmorite likewise agreed to maintain the McCurdy's store site at Eastview Mall, as is, until that date. Under the terms of the challenged acquisition, Wilmorite was to obtain that store.

The rationale for the stipulation was to maintain the transferred assets, as is, at least pending a determination of the preliminary injunction motion, so that if plaintiff prevailed, a remedy would be readily available and the Court could annul the sale and divest May and Wilmorite of the assets transferred pursuant to the challenged acquisition.

By order entered October 31, 1994, the Court directed that an evidentiary hearing be held, primarily concerning the relevant product market appropriate in the case. The need for such a hearing was discussed at length in that order, familiarity with which is assumed. In an antitrust case such as this, it is essential that both the geographic and relevant product markets be determined, in the first instance, so that the Court can properly determine the likely effect on the geographic and product markets caused by the proposed merger, acquisition or other challenged business activity.

In that same order, the Court extended the stipulated temporary restraining order until further order of the Court.

The Court conducted a hearing over three days. Ten witnesses testified at the hearing. All of these witnesses had previously submitted affidavits or declarations to the Court either in support of or in opposition to the pending motions.

As noted in my October 31 Decision, the record on the motions is quite extensive. Prior to the hearing, the Court had been "carpet bombed" [1] with hundreds of pages of documents and exhibits, 42 separate affidavits or declarations, and lengthy legal memoranda on several issues. The Court has heard extensive oral arguments on the motions and also received post-hearing briefs from all of the parties.

### The Parties

Bon–Ton is an independent regional department store company based in York, Pennsylvania with the majority of its stores in Pennsylvania. In July 1994 Bon–Ton acquired ten stores in the greater Buffalo, New York metropolitan area, giving them 14 stores in upstate New York. In 1993 Bon–Ton had net sales of approximately $337 million. Bon–Ton currently has no stores in the Rochester metropolitan area.

McCurdy's, an independent closely-held department store company based in Rochester, New York, owned and operated 12 stores in New York, nine of which were in the Rochester metropolitan area. McCurdy's, founded in 1901, had been one of Rochester's premier department stores for many years. Eight of the 12 stores were operated under the "McCurdy" name, and four were operated under the name "B. Forman." McCurdy's 1993 net sales amounted to some $83 million.

The May Department Stores Company is a holding company based in St. Louis, Missouri that owns and operates over three hundred department stores throughout the country.[2] It is one of the largest department store companies in the United States. Its stock is traded on the New York Stock Exchange and in 1993 it had net sales of approximately 11 billion dollars. One of the department stores owned by May is Kaufmann's, which operates forty stores in Pennsylvania, West Virginia, Ohio and New York. Kaufmann's presently operates four department stores in the Rochester, New York metropolitan area. All of these stores are located in major shopping malls: The Mall at Greece Ridge ("Greece Ridge"), Marketplace, Irondequoit and Eastview Malls.

Wilmorite, Inc., founded in 1950 with headquarters in Rochester, New York, is involved in large-scale real estate development, generally in the northeast United States. It has developed twenty-three large retail centers in New York, Connecticut, New Jersey and Illinois, including regional shopping malls and community shopping centers.

In the greater Rochester area, Wilmorite has developed the five largest shopping malls, including Greece Ridge, Eastview, Marketplace, and Irondequoit Malls and Pittsford Plaza.

In addition to the development of shopping malls, Wilmorite has developed other types of property, including apartments, office buildings and urban redevelopment projects.

1. *Consolidated Gold Fields PLC Inc. v. Anglo American Corp.*, 713 F.Supp. 1457, 1475 (S.D.N.Y.), *aff'd*, 871 F.2d 252 (2d Cir.), *cert. dismissed*, 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989).

2. Some of these include: Hecht Co. which operates in Virginia, Maryland, the District of Columbia, North Carolina and South Carolina; Filene's, which operates in New England; and Lord & Taylor.

An affiliated company of Wilmorite, Genesee Management, manages Wilmorite's properties, including twenty-two shopping centers, totalling approximately seventeen million square feet of gross leasable space, as well as apartment projects, office projects and a hotel. Wilmorite is not in the department store business, and it does not compete with either Bon–Ton or May.

### McCurdy's Decision To Close

In the spring of 1994, after a series of financial misfortunes, McCurdy's determined to close its retail operation and sell its assets, including all of its twelve stores.

McCurdy's retained TM Capital Corp. ("TM"), an investment banking firm in New York City, to arrange the sale of its department store assets. TM recommended a "controlled auction" sale where numerous potential purchasers are courted simultaneously. Affidavit of Michael S. Goldman, sworn to October 5, 1994, ¶¶ 7–8. Thirty-six potential purchasers throughout the United States and Canada were notified and sixteen were sufficiently interested to obtain a Confidential Descriptive Memorandum, prepared by TM, which described the operations of the McCurdy's and B. Forman stores and contained detailed historical and financial information about the stores.

Both Bon–Ton and May obtained this information and these two firms were the only two engaged in serious negotiations with TM for the purchase of McCurdy's. There were extensive discussions among TM and representatives of Bon–Ton, McCurdy's and May. Apparently neither May nor Bon–Ton were informed by TM as to each other's interest as a potential bidder.

On June 1, 1994, McCurdy's accepted May's offer to buy eight of the 12 McCurdy's department stores, six of which are in the Rochester area, for $17.75 million. On June 3, 1994, this agreement was memorialized in a letter of intent between McCurdy's and May. An Asset Purchase Agreement dated July 1, 1994, specifying the terms of the sale was executed on September 19, 1994.

### Asset Purchase Agreement

May agreed to purchase a total of eight McCurdy's stores, six in the Rochester area, one in Elmira, New York, and one in Syracuse, New York. The six stores in the Rochester area are the McCurdy's sites at Marketplace, Irondequoit, Greece Ridge and Eastview Malls and the B. Forman Stores at Pittsford Plaza and Marketplace Mall. The Elmira and Syracuse stores are not at issue here.

It is clear that May never intended to operate all six of the new stores as Kaufmann's stores. May had discussions with Wilmorite, and it was agreed that contemporaneously with May's purchase from McCurdy's, the McCurdy's store at Eastview and both B. Forman stores at Pittsford Plaza and Marketplace Mall would be conveyed to Wilmorite, without restriction. Wilmorite was free to dispose of those sites as it saw fit.

The three other McCurdy's sites at the regional malls were to be remodeled and converted to Kaufmann's stores as follows: the former McCurdy's sites at Marketplace and Irondequoit Malls were to be remodeled and used as an expansion of the existing Kaufmann's store in the mall. In other words, Kaufmann's intended to do business in two separate buildings at these malls. The third former McCurdy's store at Greece Ridge was to be remodeled for use as a Kaufmann's store and when the remodeling was completed, May intended to convey the present Kaufmann's store at that mall to Wilmorite.[3]

The upshot of the purchase from McCurdy's and the transfers to Wilmorite is that Kaufmann's would operate a store in each of the four major malls and at two of those malls, Kaufmann's would operate a store at two separate locations in the mall. In addition, May will soon open a new Lord & Taylor store at the Eastview Mall site.

---

3. Thomas Wilmot, President of Wilmorite, stated in his affidavit, sworn to on October 6, 1994, that Wilmorite had "an oral understanding" (¶ 4) with May that Wilmorite would purchase the former Kaufmann's store after May completed its remodeling and occupied the McCurdy's site there.

## Claims Of The Parties

Bon–Ton and the State claim that the asset purchase agreement between McCurdy's and May will have significant anti-competitive effects and will allow May to dominate the traditional department store market in the metropolitan Rochester area. Bon–Ton claims in its First Amended Complaint that the acquisition "creates a monopoly" (¶ 3) in the traditional department store market in the Rochester area, and violates federal and state antitrust laws.

According to Bon–Ton and the State, the "relevant product market" within the meaning of both state and federal antitrust laws is what they denominate as "traditional department stores." Although plaintiffs do not concede that J.C. Penney should be in this group, apparently because it is a "national chain" department store, if J.C. Penney is included in the relevant product market, May would control over 50% of the traditional department store market in the Rochester metropolitan area. (First Amended Complaint, ¶ 12).

Bon–Ton and the State also claim that the acquisition is anti-competitive because it effectively obstructs entry into the market by Bon–Ton or any other department store. By virtue of this purchase, May's will have acquired all of the available space for a department store in the four major regional malls in the metropolitan Rochester area. Bon–Ton and the State claim that effective competition can only be accomplished if Bon–Ton is allowed access to these regional malls.

Defendants dispute all of plaintiffs' claims, in large part because they proceed from a different premise. Defendants contend that the relevant product market definition espoused by plaintiffs is fatally flawed. They challenge plaintiffs' assertion that the appropriate relevant market is "traditional department stores." In defendants' view, such a definition is under-inclusive because it overlooks numerous businesses that compete with department stores.

In defendants' view, once the relevant product market is properly defined as all stores selling general merchandise, apparel and furniture ("GAF"), the competition among entities selling such merchandise is so great that the merger at issue between McCurdy's and May's would have a minimal effect on May's market share and virtually no effect on competition.

Defendants also dispute Bon–Ton's assertion that its entry into the market is precluded because of May's potential dominance at the four regional malls. Defendants claim that there are numerous other suitable sites in other shopping malls, strip malls and "stand-alone" locations where space is available for a department store.

Defendants also contend that Bon–Ton has no standing to maintain this antitrust action since it has not and will not suffer any antitrust injury. Defendants contend that the claimed injuries suffered by Bon–Ton would have occurred independent of the alleged anti-competitive acts charged in the complaint. Because McCurdy's went out of business, its sale to any competitor of Bon–Ton, including May, would have the same effect on Bon–Ton, which is not now in the Rochester market.

## DISCUSSION

After considering all of the materials submitted, I conclude that plaintiffs have established a likelihood of success in proving at trial that the proposed sale of McCurdy's assets to its principal competitor, May, violates both federal and state antitrust laws. It is clear that the challenged acquisition may substantially lessen competition in the relevant market in the Rochester, New York area. Plaintiffs have, therefore, made out a proper case for issuance of a preliminary injunction to vacate and annul the sale and to enjoin May from acquiring McCurdy's assets.

Plaintiff has met the requisite standards for issuance of a preliminary injunction in an antitrust action where the public interest is involved. Under the appropriate standards, which will be discussed in detail, the Court is charged with enjoining acquisitions in commerce which "may" substantially decrease competition in the market. The probability of such a deleterious effect, not the certainty of it, is all that is required. In my view, it is clear that competition will be affected—significantly—by this acquisition. Plaintiffs

have clearly met their burden and, therefore, they are entitled to a preliminary injunction vacating and nullifying the entire sale of assets from McCurdy's to May.

### Standards For Granting A Preliminary Injunction

■ In the Second Circuit a court may issue a preliminary injunction upon a showing of irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation with a balance of the hardships tipping decidedly toward the party requesting the injunction. *Acquaire v. Canada Dry Bottling Co. of New York*, 24 F.3d 401, 409 (2d Cir.1994); *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir.), *cert. dismissed*, 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989); *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979).

■ The applicant for such an injunction must show "injury for which a monetary award cannot be adequate compensation ... [because] where money damages is adequate compensation a preliminary injunction will not issue." *Jackson Dairy*, 596 F.2d at 72.

The seminal Second Circuit case on the subject of preliminary injunctions in antitrust actions is *Gulf & Western Indus., Inc. v. Great A. & P. Tea Co., Inc.*, 476 F.2d 687 (2d Cir.1973). The court there took great pains to explain the standards for granting a preliminary injunction in an antitrust case.

The purpose of a preliminary injunction is to maintain the status quo pending a final determination of the merits.... It is an extraordinary remedy, and will not be granted except upon a clear showing of probable success *and* possible irreparable injury.... However, '*the burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief.*' In such a case, *the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation.*

*Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2d Cir.), *cert. denied*, 394 U.S. 999 [89 S.Ct. 1595, 22 L.Ed.2d 777] (1969) (citations omitted) (emphasis in original).

*Gulf & Western*, 476 F.2d at 692–93.

■ With respect to irreparable harm, "doubts as to whether an injunction sought is necessary to safeguard the public interest ... should be resolved in favor of granting the injunction." *Id.* at 699 (citations omitted), but it is clear that "possible irreparable injury" is a requirement of all preliminary injunctions. *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir.1990).

■ As to the "probability of success on the merits" requirement in antitrust cases, it is up to the Court to decide whether the evidence presented demonstrates that plaintiffs' allegations are of sufficient substance as to warrant an examination of the other requirements necessary to grant a preliminary injunction. *Gulf & Western*, 476 F.2d at 693. The ultimate inquiry relates to the effect the challenged transaction will have on competition. "[T]he critical question is whether the probable future effect of the transaction will be substantially to lessen competition." *Id.* at 694 (citations omitted).

### The Antitrust Laws: Purpose and Design

In determining whether a preliminary injunction should issue, the Court must determine if there is a substantial likelihood of success on the merits. To determine that, the Court must examine the substantive law upon which the complaint is based, in this case, the federal and state antitrust laws.

■ This analysis must begin with an understanding of the basic premise of the antitrust laws. A review of the relevant statutes reveals that Congress intended to vest the courts with broad power to prohibit and enjoin mergers and acquisitions even when the future anti-competitive effects are only probable rather than certain. For example, § 7 of the Clayton Antitrust Act prohibits mergers and acquisitions the effect of which "may be substantially to lessen competition." 15 U.S.C. § 18.

This language is most significant. Competition is so important that mergers or acquisitions that "may" lessen competition are prohibited. The Supreme Court has specifically recognized that by using the phrase "may", Congress was concerned "with probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962).

The Supreme Court has also said that the "grand design" of § 7 "was to arrest *incipient* threats to competition which the Sherman Act did not ordinarily reach. It follows that actual restraints need not be proved. The requirements of the amendment are satisfied when a 'tendency' toward monopoly or the 'reasonable likelihood' of a substantial lessening of competition in the relevant market is shown." *United States v. Penn–Olin Chem. Co.*, 378 U.S. 158, 170–71, 84 S.Ct. 1710, 1716–17, 12 L.Ed.2d 775 (1964) (emphasis added). *See also United States v. Continental Can Co.*, 378 U.S. 441, 465, 84 S.Ct. 1738, 1751, 12 L.Ed.2d 953 (1964) (purpose of § 7 is "to arrest anticompetitive arrangements in their incipiency").

In this regard, the Second Circuit has observed that "[r]equiring a plaintiff to prove that substantial lessening of competition is inevitable would thwart the express intent of Congress to nip anticompetitive practices in the bud before they blossom into a Sherman Act restraint of trade, and would run counter to Congress' view that neither the [Federal Trade] Commission nor the courts should be charged with possession of powers of prevision that no one else has achieved." *Fruehauf Corp. v. F.T.C.*, 603 F.2d 345, 351 (2d Cir.1979) (citation omitted). The court added that although a "mere possibility" of lessened competition will not render an acquisition illegal, a " 'reasonable probability' of a substantial impairment of competition" will suffice. *Id.* (quoting *Brown Shoe*, 370 U.S. at 323, 82 S.Ct. at 1523).

Using these general principles as a framework, I believe that plaintiffs have clearly established that they are entitled to a preliminary injunction to enjoin this sale which has the reasonable probability of substantially lessening competition.

## Relevant Market

■ A necessary first step in the evaluation of an antitrust claim is a determination of the relevant product market and geographical market. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974); *Spectrum Sports, Inc. v. McQuillan*, —— U.S. ——, ——, 113 S.Ct. 884, 892, 122 L.Ed.2d 247 (1993). Only when these markets have been defined can the court analyze the likely market effects of the proposed acquisition.

The definition of relevant product market is the fundamental point of dispute among the parties. As is the case in many antitrust cases, this definitional question is crucial. To a great extent, this case hinges on the definition of product market.

An essential guide to analyzing the relevant markets is the Supreme Court's seminal decision on this subject, *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Although that case was decided in 1962, it is still frequently cited as one of the controlling Supreme Court decisions in this area.

As the Court in *Brown Shoe* noted, Congress did not create any particular test for measuring the relevant product or geographical markets, nor did Congress define precisely what was meant by "substantially" affecting competition. *Id.* at 320–21, 82 S.Ct. at 1521–22. The relevant parameters of these terms, however, have been fleshed out by case law.

■ The relevant geographical market has been defined as the region "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963). There is apparently no dispute in this case that the relevant geographical market is the six-county Rochester metropolitan region. That is plaintiffs' position, and defendants have not contended otherwise.

■ As mentioned, the parties do vigorously dispute what constitutes the relevant

product market. The Supreme Court has defined the relevant product market in terms of the "reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524; *see also United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). "Cross-elasticity of demand refers to the change in the demand by consumers for one product as a result of a change in the price of another product." *Hayden Pub. Co. v. Cox Broadcasting Corp.,* 730 F.2d 64, 70 n. 8 (2d Cir.1984). In general, then, the question is whether two products can be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other. *Id.* at 71.

Dr. Douglas F. Greer, an expert in industrial economics called by plaintiff, acknowledged the essence of this formulation in his testimony. He testified that determining product market involves a process of "inclusion and exclusion." (Tr. 159).[4] It is important to include in the relevant market "all those who are offering close substitutes in the way of products, or in this case, retailing services." *Id.* Those services should be excluded that merely offer "distant substitutes or no substitutes whatsoever." *Id.*

█ In addition to the general product market within which products compete, however, the Supreme Court has also recognized that in an appropriate case, the broad product market may be subdivided into well-defined submarkets. *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524. These submarkets themselves constitute product markets for antitrust purposes, *id.,* and the statute expressly requires that the Court analyze any activity which may substantially lessen competition "in *any* line of commerce," 15 U.S.C. § 18 (emphasis added). Where a submarket does exist, therefore, the Court cannot limit its analysis to the general market, but must also "examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed." *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524.

The Court in *Brown Shoe* set forth seven factors for determining whether a submarket exists, namely "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, and specialized vendors." *Id.* The Court described these criteria as "practical indicia" rather than as a litmus test, and subsequent decisions have made clear that submarkets can exist where only some of these factors are present. *See, e.g., Beatrice Foods Co. v. FTC,* 540 F.2d 303 (7th Cir.1976) (industry recognition, peculiar characteristics, different production methods and prices); *International Tel. and Tel. Corp. v. General Tel. & Elec. Corp.,* 518 F.2d 913, 932 (9th Cir.1975) (*Brown Shoe*'s indicia were intended as "practical aids ... rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue").

Obviously, in a broad sense, traditional department stores compete in a vast marketplace encompassing retailers in general. There is no reason, however, why submarkets could not exist within that broad market, if practical indicia of submarkets are present, under the *Brown Shoe* analysis. This analysis seems appropriate to the May acquisition of McCurdy's and the definition of relevant product market.

The parties are, of course, at loggerheads as to the relevant product market. Plaintiffs contend that the market is defined as "traditional department stores." If the market is so defined, because of the paucity of such stores in the geographic market, May's acquisition of McCurdy's would greatly increase May's market share to such an extent that it would have the potential to substantially lessen competition.

Defendants' view is that the product market is much broader. They have used the census characterization with the acronym "GAF," that is, general merchandise, apparel and furniture. When so analyzed, May's ac-

---

4. "Tr." signifies the transcript of the evidentiary hearing on November 14–16, 1994.

quisition of McCurdy's has a negligible effect since the GAF category is very broad indeed.

The parties have struggled valiantly to try to prove (or disprove) who "competes" with traditional department stores. Competition, however, can mean different things in different situations, and is not necessarily dispositive of the boundaries of the product market. In one sense, all retail establishments that sell a type of merchandise (be it clothing, cosmetics, toys, books, etc.) compete to a *degree* with each other for the consumers' dollar. *Cf. Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1299 (9th Cir.1993) ("a change in one product's price has some infinitesimal effect on demand for every other product"), *cert. denied*, —— U.S. ——, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994).

Nevertheless, the fact that two vendors both sell a particular type of merchandise does not necessarily mean that they are in the same product market. If the market were defined that broadly, it is hard to conceive of any merger or acquisition involving retailers that would have an anti-competitive effect. "The boundaries of the relevant market must be drawn with sufficient breadth to include the competing products of each of the merging companies and to recognize competition where, in fact, competition exists." *Brown Shoe*, 370 U.S. at 326, 82 S.Ct. at 1524. That does not mean, however, that the market boundaries should be drawn beyond what is merely "sufficient" to include competition which is so limited or marginal that its practical effects are negligible.

Courts have cautioned that in antitrust matters, "actual market realities" are of key significance. *Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 466, 112 S.Ct. 2072, 2082, 119 L.Ed.2d 265 (1992). Hypothetical formulas and paradigms are less important in this sphere than concrete economic realities. Thus, in defining the relevant product market, "the reality of the marketplace must serve as the lodestar." *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir.1987).

In my view, the GAF definition postulated by defendants is much too broad for the purpose of determining the potential anti-competitive effect of this acquisition. Such a definition includes hundreds of retailers, some of whom affect each other only to a minimal degree. The GAF definition therefore ignores the realities of the Rochester, New York marketplace.

It is of no consequence that plaintiffs have not *expressly* designated their proposed product market as a submarket. It is clear from their arguments that that is the theory and defendants recognize it as such. (*See, e.g.*, Post–Hearing Memorandum of Wilmorite (Dkt. 109), pp. 9–10). Nomenclature or terms of art are less important than are the practical realities of the marketplace. Whether the term "submarket" or "market" is used, the legal analysis should be the same. *See Allen–Myland v. IBM Corp.*, 33 F.3d 194, 208 n. 16 (3d Cir.1994) (use of term "submarket" is somewhat confusing, and it would be more accurate simply to speak in terms of the relevant market); *Olin Corp.*, 986 F.2d at 1299 ("every market that encompasses less than all products is, in a sense, a submarket").

■ On the evidence presented, I believe that plaintiffs have made a sufficient showing that "traditional department stores," including J.C. Penney's, constitutes a viable submarket within the broad GAF product market.

Much of the testimony at the hearing and in the declarations submitted to the Court relate to the differences between the so-called traditional department store and other retailers such as specialty shops, discounters and catalog merchandisers. Viewed singly, some of these differences may seem trivial (e.g., the location of cash registers throughout the store rather than in a group near the main exit). Others are intangible (e.g., the attractiveness of the merchandise displays).

Cumulatively, though, these differences do give rise to a qualitative difference between department stores and other retailers. To paraphrase Justice Potter Stewart's often-quoted comment made in another context;[5]

---

5. *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (concurring opn.) ("I shall not today attempt further to

customers know a department store when they see it. Anyone who has ever shopped in a department store, specialty store or dis-counter certainly knows that there is a differ-ence, and I believe that the difference is significant.

Several witnesses testified or presented declarations for plaintiff with extensive expe-rience in the retail industry. They testified that traditional department stores provide a distinct, identifiable, "product" that distin-guishes department stores from other retail-ers. They described that which makes a department store different from other retail-ers. I find their testimony compelling, and I credit it.

Generally, these experts divided the retail market into at least four categories: tradi-tional department stores, specialty shops, discount stores and mail order merchandi-sers. Although there is some overlap, each is distinctive. Their testimony compels the conclusion that traditional department stores are sufficiently distinctive relative to other retailers because of the nature of the goods and services sold that department stores should be the relevant product market for purposes of analyzing the acquisition of McCurdy's.

Robert Warner, President of Robert M. Warner Associates, testified for plaintiff and identified department stores as a distinct type of retailer. His experience in the indus-try was extensive and significant. He had been employed for twenty-three years at Macy's Department Store and became Gen-eral Manager of the main store at Thirty–Fourth Street and Broadway in New York City. He had also been employed at E.J. Korvette as Senior Vice–President and Gen-eral Merchandise Manager. At another time in his career he was in charge of all specialty shops for W.R. Grace Company. He had also served as President of K.G. Men's Store, a men's retailer with thirty stores and annual sales of 80 million dollars. In addition, from 1983 to 1987, he had served as President of Steinbach's, a 20–million–dollar–a–year de-partment store chain.

He testified, in part, that the department store was a distinct type of retailer. Cus-tomers shop department stores, in his view, primarily to obtain upscale, brand name fash-ion merchandise, especially women's fashion apparel. The department store is distin-guished by its wide assortment of brands as well as the quantity and quality of merchan-dise in addition to its emphasis on cutting-edge fashion. (Tr. 336–339; Ex. 103, p. 10).

Warner distinguished specialty stores and discounters. In his view they are not pri-mary competitors of department stores. Discount stores deal mostly in hard goods as opposed to the soft goods and fashion items sold by department stores. Specialty stores also provide a narrower focus and appeal to one or very few types of customers. They are much smaller, often deal with private brand labels and cannot compete with the upper-level brand names and high fashion items sold principally in department stores. (Tr. 339–341).

Bernard Olsoff also testified for plaintiff. He is President of Frederick Atkins Incorpo-rated in New York City. Frederick Atkins is an international merchandising and market-ing organization representing twenty-four major traditional department stores in the United States. He has had over forty years experience in the retail industry as a consul-tant and for twelve years he was employed as President of the Merchandising Division of May. (Tr. 290–292).

He identified department stores as filling a special need of customers. Department stores have a track record for providing qual-ity merchandise, especially in the area of fashion. The most significant reason for this is that department stores rely on well-known brand merchandise such as Liz Claiborne, Polo, Nautica, and others. Department stores are the primary and, in some instanc-es, exclusive outlet for such merchandise. In addition, department stores are the principal source for higher priced, brand-name cos-metics such as Estee Lauder, Clinique, Lan-come and Elizabeth Arden. (Tr. 293–294).

Department stores clearly meet customer demand by providing a wide range of brand-

define [hard-core pornography] ... But I know it when I see it ...").

name merchandise and service. Customers have come to rely on department stores to provide such items. Both Olsoff and Warner gave testimony, which I credit, that other retailers, for example specialty shops and discount stores, do not fill the customer demand or provide the same "product" that department stores do. They are distinct, different retailers serving a different product to a different customer.

Olsoff testified that there is a close relationship between manufacturers of brand-name items and department stores. In order to protect their image, many manufacturers try to sell their merchandise exclusively to department stores. According to Olsoff, these manufacturers spend considerable time reassuring department stores that the brand-name products will not be sold to discounters, or other retailers. (Tr. 300–301). In order to maintain the image of the brand name as being of high quality and at the cutting-edge of fashion, manufacturers encourage the exclusivity fostered by department stores. Concerning brand names, the department store provides the customers with "breadth of selection, [and] multiplicity of vendors." (Tr. 301). This choice of a broad range of brand merchandise, especially in women's apparel and cosmetics, is the distinctive feature of department stores.

In addition to this testimony, there was other evidence submitted by means of affidavit and declarations that also supports the view that traditional department stores are the relevant market. For example, Frederick R. Warren–Boulton submitted a forty-two page declaration with numerous exhibits, dated November 2, 1994. Warren–Boulton has extensive and significant experience in this area. He received a Ph.D. in Economics from Princeton University and was a Professor of Economics at Washington University in St. Louis for eleven years. For six years, from 1983 to 1989, he served as Chief Economist for the Antitrust Division of the United States Department of Justice. While at the Department of Justice, he supervised the economic analysis of all merger, price-fixing and monopolization cases. Based on his thorough analysis, including a review of the United States Department of Justice Horizontal Merger Guidelines,[6] he determined that the relevant antitrust market in this case should be "all traditional department stores plus J.C. Penney." Warren–Boulton Declaration, at 42. In addition, he determined that the proposed acquisition by May would likely result in an increase in market concentration and a resulting increase in prices paid by consumers. *Id.*

It is clear that over time, the department store has changed its focus. In 1994 the traditional department store sells a more limited and different type of product than it did twenty or thirty years ago. Many goods and services formerly offered by department stores are no longer available there or are sold at a much-reduced level. For example, toys, books, and most large appliances have virtually vanished from the shelves of most traditional department stores. Specialty stores dealing in one or more such items have largely supplanted department stores as the providers of such goods. But this does not mean that the department store no longer provides a distinctive type of product to an identifiable type of customer.

I was persuaded by the testimony of Dr. Greer, who indicated that department stores have responded to these changes in the marketplace by concentrating on establishing their dominance in several key areas, particularly women's apparel and cosmetics. It is in these areas that department stores have a niche that seems to be an appropriate submarket. (Tr. 169–171).

Defendants introduced some evidence that consumers are able to obtain brand-name goods at other types of retail establishments, such as small boutique shops and outlet centers. Nevertheless, the evidence as a whole indicated that department stores are a submarket distinct from those other types of vendors, and that both the industry and the public recognize that distinction. Department stores typically provide several different brand names for a given type of merchandise. Within a brand name, the line of merchandise offered tends to be relatively

---

**6.** Department of Justice and Federal Trade Commission Horizontal Merger Guidelines, reprinted in 4 Trade Reg.Rep. (CCH) ¶ 13,104 (Apr. 2, 1992). (Hereinafter "Merger Guidelines").

extensive. With clothing in particular, the consumer can also expect to find current fashions. Department stores are also fairly reliable in the sense that a store that carries a certain line of cosmetics, for example, will usually have that line in stock and available on any given day. In contrast, a shopper at a smaller store or outlet center may have fewer brands to choose from; the selection may be spotty or limited by what the retailer was able to purchase in bulk or at a discount; and clothing, while it may have a designer label, may be from last year or earlier, which can be significant to a fashion-conscious consumer.

There was also evidence presented at the hearing that in many instances, manufacturers and distributors of brand-name women's clothing and cosmetics will distribute their goods only to traditional department stores. By doing so, the manufacturers maintain a certain aura of status and exclusivity for their wares that they could lose if they made their products widely available through many other types of retailers. This exclusive, high-fashion image is important both to the manufacturer and to the department store, and has given rise to a symbiotic relationship between the two. Although a customer may be able to obtain a functionally similar product through some effort, the department store provides greater choice, quality and availability of brand-name products in women's apparel and cosmetics.

This distinction between functional utility and the perception of the consumer undercuts much of the force of defendants' proof. Defendants have attempted to show that many of the *types* of items offered by department stores can be gotten from other sources, such as catalogs, specialty stores, and discounters. I am persuaded, however, by the testimony of plaintiffs' witnesses who stated that there is a "core customer" of department stores who tends to shop for women's clothing mostly, if not exclusively, at traditional department stores. This consumer is interested in up-to-date, fashionable, brand-name items. To such a person, a non-branded or private-label jacket may *not* be the equivalent of a designer jacket, regard-less of whether its physical properties are the same.

This is not to say, of course, that consumers can be neatly divided into camps, each of which patronizes only one particular type of retailer. As stated earlier, all vendors who sell a type of merchandise compete to some degree, and a dollar spent at a discount store might be viewed as a dollar not spent at a department store. Nevertheless, I find that plaintiffs presented credible evidence that, particularly where high-fashion women's apparel and cosmetics are concerned, the traditional department store is distinctive, and provides customers with goods and services not otherwise available.

Plaintiffs also presented testimony at the hearing that May's acquisition of McCurdy's would likely result in Rochester-area customers paying five-percent more for department store merchandise. (Tr. 37, 117).

As an aid in determining the product market, the Department of Justice and the Federal Trade Commission (jointly referred to as "the Agency") have created the "five-percent" test. *See* Merger Guidelines, ¶ 13,104, § 1.11. Under this test, the Agency seeks to identify a group of products such that a hypothetical monopolist over those products would profitably impose at least a "small but significant and non-transitory" price increase. In making this determination, "the Agency, in most contexts, will use a price increase of five percent lasting for the foreseeable future." *Id.* The smallest group of products that satisfies this test is then considered to be the product market.

I find the testimony and proof credible that consumers can expect to pay at least a five-percent increase and this further supports the view that department stores are the appropriate market.

That this evidence supports a finding of a traditional department store submarket is made even more apparent when one considers the factors set forth in *Brown Shoe.* First, it is plain that both the industry and the general public recognize department stores as a discrete economic entity. Although there is evidence that, in a broad sense, department stores face "competition"

from other kinds of retailers, the evidence also shows that the latter are seen by most people as just that: other *kinds* of retailers. Department stores are distinguishable from other categories of vendors based on the types of products they sell, their prices, staffing policies—in short, all of the factors that go into making a department store a department store and not, say, a discount store such as Wal–Mart. Those differences in the public's perception of these various kinds of retailers in turn indicates that for many consumers, department stores have certain "peculiar characteristics and uses." While a given consumer may do some shopping at a department store and some shopping at a discount store, it is likely to be for different kinds of goods. Department stores therefore serve a function distinct from that fulfilled by other types of stores.

Testimony at the hearing, and internal company documents prepared by the parties in this action, also indicate that department stores themselves recognize each other as competitors different from other retailers.

One means utilized to determine the relevant product market is to analyze how the competitors themselves view the market. "Analysis of the market is a matter of business reality—a matter of how the market is perceived by those who strive for profit in it." *F.T.C. v. Coca–Cola Co.,* 641 F.Supp. 1128, 1132 (D.D.C.1986), *vacated as moot,* 829 F.2d 191 (D.D.C.1987).

It is evident from the proof, and I find it as a matter of fact, that those in the department store business view other department stores in their geographic market as their principal competitors. Concerning the Rochester market, there is documentary evidence and oral testimony to support that view. Although it is true on the grand scale that all retailers "compete" for every customer dollar, it is clear that those in the department store business view each other as the primary competitor.

Although there is always a danger of taking discrete corporate documents out of context, nevertheless, several internal documents of May and other testimony support the assertion that department stores carefully watch and monitor each other to gain a competitive edge.

Bernard Olsoff, who worked for May for twelve years as President of the May's Merchandise Division, testified that while at May's he considered other department stores located in shopping malls to be May's competition, and it was principally as to those stores that May would adjust its prices. (Tr. 318).

Several May documents catalog the respective market share and inventory of department stores in the area, such as Kaufmann's, McCurdy's, Forman's and J.C. Penney's (Ex. 103, ¶ 33). Another document, Ex. 103, Attachment 7, an internal strategic planning document of May, lists the market share of "selected competitors" both before and after the proposed acquisition of McCurdy's. Only traditional department stores are listed. After the acquisition, the anticipated market share among these competitors (totalling 100% of the market) are Kaufmann's, J.C. Penney and Lord & Taylor.

Other internal May documents, Exs. 35 and 36, also show a preoccupation with the effect one competitor, Bon–Ton, a traditional department store, would have if Bon–Ton took over the McCurdy's stores. Exhibit 35, a strategic planning document of May, discusses the sales potential that could develop if May purchased the McCurdy's stores. The document is revealing in several respects. First of all, there is no discussion of the adverse effect to May if non-department store retailers take over McCurdy's. One of the assumptions underlying the analysis is that "no other traditional department store" would enter the market in 1994–97. (Exhibit 35). This shows a preoccupation with department stores, not retailers in general. The focus is also directed specifically to the effect on May if a department store, Bon–Ton, entered the market and purchased McCurdy's. The estimate is that May's sales would be "negatively impacted (5%) beginning in 1996."

McCurdy's own internal documents also suggest that its primary competitors were Kaufmann's and J.C. Penney. (Ex. 103, Attachments 8 and 9). One document, Ex. 103, Attachment 9, states specifically:

As indicated in the Summary Analysis of Competition, . . ., the Company's primary competitors are Kaufmann's and J.C. Penney. This is not to downplay the importance of specialty stores (e.g., The Limited, Casual Corner, or The Gap) nor the growing presence of both K–Mart and Wal–Mart in the more traditional department store soft goods areas, but at least in the plan, Kaufmann's and Penney's remain the primary focus of attention.

Furthermore, several witnesses at the hearing, whom I credit, testified that while employed at Kaufmann's (Tr. 96–98), and McCurdy's (Tr. 266–268) they made pricing decisions after checking and monitoring other department stores. A procedure was maintained at both Kaufmann's and McCurdy's to carefully monitor the prices and sales of these other department stores and price concessions would be based on what other department stores were doing. There was no monitoring of specialty stores and no price fluctuations based on their activities (Tr. 96–98, 268–269). Such a pricing procedure and monitoring process also suggests that department stores are a viable submarket. *See General Foods Corp. v. FTC,* 386 F.2d 936, 941 (3d Cir.1967) (noting FTC finding of industry recognition of household steel wool submarket, in part based on testimony of household steel wool producers that they looked to each other in setting their prices), *cert. denied,* 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968).

Distinct prices, of course, are themselves another *Brown Shoe* factor. The testimony here showed that department store prices do tend to be different from other retailers'. In part this is attributable to their monitoring of competing department stores, but it also undoubtedly reflects the distinctiveness of their merchandise. Brand-name apparel sold by discounters or outlet stores would tend to have lower prices than those charged by department stores because that apparel is often from older, and therefore less fashionable, styles. Unbranded and private-label goods may also be priced lower because for many consumers they lack the cachet of brand-name merchandise.

"Unique production facilities," strictly speaking, may seem to be of little relevance when the "product"—department stores—is not literally "produced" in the way that a piece of machinery is produced. By analogy, however, this concept can be applied to department stores as physical entities. There was testimony adduced at the hearing that department stores' layouts tend to share certain features such as the location of checkout counters, the manner in which goods are displayed, and so on. While that alone would not qualify them as a submarket, it is in my view another *Brown Shoe* criterion that supports plaintiffs' case.

There is also some evidence that department stores have distinct customers. This may be less of a factor here than in a case involving, for example, highly specialized industrial equipment, but there was credible evidence that there exists a "core customer" who shops for certain types of goods much more at department stores than at other kinds of retailers. These customers rely on department stores to provide them with the quality, selection, and service that they are seeking, and the department stores in turn target these customers as their primary consumer. This was also supported by statistical evidence which showed that there were differences between the median incomes of the average department store customer and the average customer of other retailers.

Customer preferences and tendencies are also helpful in determining the market. In order to gauge customer shopping preferences, Bon–Ton retained a marketing research firm, Harte–Hanks Market Research, which surveyed approximately three hundred and forty customers at four separate Bon–Ton stores located in Maryland, Pennsylvania and New York on October 15–16, 1994. This process and its results are set out in the Declaration of Harry D. Seymour, dated October 25, 1994.

Of those respondents who made a purchase and who had shopped for the purchase item at another store, 63% indicated that they had shopped for that item only at a traditional department store. Another 18% indicated that they had shopped at both a department store and a non-department

store. Only 12% indicated that they had shopped at a non-department store prior to making their purchase at Bon–Ton. This survey suggests that a substantial number of consumers utilize other department stores (where available) to comparison shop for items they eventually purchase at a department store.

Defendants also submitted the results of a survey of Rochester-area shoppers that they undertook in September 1994. This survey asked consumers what stores would be their first and second choices for purchasing casual clothing and accessories. Defendants contend that the results show significant "cross-shopping" in that many persons listed a department store (Kaufmann's or J.C. Penney) as their first choice and a different kind of store as their second choice, or vice versa. This survey is of limited value, however, for it was undertaken after McCurdy's closed. Thus, a person who listed Kaufmann's as a first choice would have had only one other department store, J.C. Penney, to consider as a second choice (in fact, it appears that J.C. Penney was the single most frequently named alternative to Kaufmann's). Moreover, some of the evidence in this case suggests that J.C. Penney is still in the process of repositioning itself as more of a traditional department store; for example, it still has a much smaller percentage of brand-name items among its merchandise than Kaufmann's or McCurdy's. The survey, then, would have been far more meaningful if it had been done when McCurdy's was still operating.

As used in *Brown Shoe*, "specialized vendors" referred to the vendors of the product in question (e.g. shoe stores). No one, of course, "sells" department stores. On the other hand, there is evidence that many of the vendors who sell *to* department stores are specialized, first, in the sense that they sell recognized brand-name merchandise, and second, because they often sell only to department stores.

Once again, it must be emphasized that the Supreme Court listed these factors as "practical indicia," not as a mechanical formula. The Court also stated those indicia in the context of a case involving a product much different from that at issue in the instant case. The underlying theme of *Brown Shoe*, however, as with so many other cases in the antitrust arena, is that of market realities, and specifically whether from a practical standpoint one can identify a discrete segment of the marketplace that can fairly be termed a submarket. On the evidence presented, I believe that that is the case here.

The evidence before the Court establishes that plaintiffs' alleged product market constitutes a proper submarket under the *Brown Shoe* criteria. When it discussed the nature of markets and submarkets in *Brown Shoe*, the Supreme Court stressed its concern with "practical indicia" and "commercial realities." 370 U.S. at 325, 336, 82 S.Ct. at 1524, 1530. Thus, it plainly appears that the Court did not intend to imbue the word "submarket" with talismanic significance, but used it simply as a way of characterizing a fact of commercial life: that markets are not always monolithic. The proper market for antitrust analysis is "traditional department stores including J.C. Penney's."

### Market Concentration

 If the relevant market, or submarket, is determined to be traditional department stores including J.C. Penney's, then there is little doubt that the market concentration of May would increase dramatically after the acquisition. There is little dispute on this point. The market concentration would violate the recognized guidelines and would suggest dire anti-competitive consequences.

In determining market concentration, the Merger Guidelines reference the Herfindahl–Hirschmann Index ("HHI") which is a well-recognized formula used to calculate market concentration. This formula is an aid to interpreting market data to determine the degree of existing or potential market concentration.

The HHI is calculated by adding the squares of the individual market shares of all the participants in the market. Based on this number, the Merger Guidelines consider a market to be in one of three categories: unconcentrated (HHI below 1000); moder-

ately concentrated (HHI between 1000 and 1800); or highly concentrated (HHI over 1800). Merger Guidelines, ¶ 13,104 § 1.5.

There can be little dispute here that if department stores are the relevant product market, the proposed acquisition in this case would result in a dramatic increase in the HHI to a very high level. One of plaintiffs' experts, Richard S. Higgins, calculated the current HHI to be 3395, meaning that the market is already highly concentrated. After the acquisition, the HHI would be 5074. *See* Higgins First Supplemental Declaration Ex. B.

The Merger Guidelines state that "[w]here the post-merger HHI exceeds 1800, it will be presumed that mergers producing an increase in the HHI of more than 100 points are likely to create or enhance market power or facilitate its exercise." Merger Guidelines § 1.51. The projected increase here, relative the McCurdy's acquisition, is more than *sixteen times* that amount! Clearly under the Department of Justice Merger Guidelines, these numbers reflecting concentration in the market go "off the charts."

Although defendants have attempted to demonstrate that Higgins' analysis is flawed, I do not believe that they have succeeded in doing so, particularly with respect to the pre- and post-acquisition HHIs in the traditional-department store market. With McCurdy's gone and Kaufmann's moving into two of McCurdy's former stores (and thereby preventing possible competitors from moving in), the increase in Kaufmann's share of the department-store market would certainly be large.

### *Entry Into the Market*

Another important factor in determining the anticompetitive effect of a merger or acquisition is the existence of (or lack of) barriers to enter the market. "Ease of market entry is relevant in antitrust cases because even a monopolist will not be able to exercise power over price in a market that is easily entered by potential competitors. The assumption is that, in an easily entered market, an artificial increase in price will entice bystanders to enter the market, eventually restoring competitive conditions." *Olin*

*Corp.*, 986 F.2d at 1305. Therefore, courts often "refuse to find a sufficient degree of market power for the monopolization offense when they determine that a market has low barriers to entry." *Colorado Interstate Gas v. Natural Gas Pipeline*, 885 F.2d 683, 695–96 n. 21 (10th Cir.1989), *cert. denied*, 498 U.S. 972, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990). *See also United States v. Eastman Kodak Co.*, 853 F.Supp. 1454, 1473 (W.D.N.Y. 1994).

Where barriers to entry are high, however, the opposite is true; *i.e.*, a monopolist would find it easier to raise prices because it would be unlikely that a competitor would, or could, enter the market. Thus, a showing that entry into a market would entail prohibitively high costs, such as construction costs, will support a finding of anticompetitive effects. *See, e.g., Marathon Oil Corp. v. Mobil Corp.*, 669 F.2d 378, 381 (6th Cir.1981) (high costs of building oil refinery), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982).

There is abundant evidence that for department stores, malls have become virtually the only viable location for new stores. Robert Warner testified for plaintiffs that department stores today locate in regional malls because "[t]hat's where the customers are, and there's a synergism between the developers, the department stores, [and] the customers . . ." (Tr. 342–43). He also testified that it would be "very difficult" for a department store to enter the Rochester market with only two mall locations, because the inherent difficulty of trying to break into a new market and gain consumer acceptance would be magnified by the perception that the new store was a smaller player. (Tr. 344).

Similarly, plaintiff's expert Dr. Douglas F. Greer also testified that "mall locations are becoming critical for department stores because it's part of their whole package, their whole presentation of the upscale fashion image and so on, that they need to be in the malls, as opposed to out there in the strip." (Tr. 222).

Bon–Ton's chairman, Max Thomas Grumbacher, testified that it is more economical to open a store in a mall as opposed to a stand-

alone location or strip center because mall developers offer discounted rents to attract department stores. (Tr. 18). He also stated that department stores prefer malls because the types of customers that department stores target tend to frequent malls. (Tr. 18). He also testified that he did not know of any department store in the country that had built a new facility in the last 10–15 years that was not located in a mall. (Tr. 92–93). While other businesses may locate in a strip mall or stand-alone site, department stores do not do so. In order to effectively compete, they must locate in the larger shopping malls. (Tr. 17–21, 342–344).

Even some of defendants' witnesses supported these opinions. James Mack Folsom stated during his testimony that "[t]he only thing I have seen is them [department stores] going into malls." (Tr. 447). Thomas Wilmot, the President of Wilmorite, also testified about the beneficial effect of having a department store tenant so as to increase the number of shoppers coming to the mall. (Tr. 416–17).

It is plain that May itself believes that mall locations are highly important. The mere fact that May wants to expand into vacant McCurdy's space at malls where May already has stores is an indication of the significance that May attaches to malls. May is willing to forsake some of the McCurdy sites, but it intends to retain all of the McCurdy sites in the major malls except Eastview where it already has a Kaufmann's and where it is introducing a new store, Lord & Taylor.

I am not prepared to say on the basis of this record that, if the McCurdy's sale were allowed to stand, the entry by a competitor would be impossible. Clearly it is not. But, on the other hand, it is obvious that a significant and substantial barrier to entry would exist if May obtained all of the present space in the four major regional shopping malls. This factor, together with all the others, compels the conclusion that the proposed purchase will most probably have grave anti-competitive affects.

### Harm to Consumers

There was also persuasive evidence that the acquisition will hurt consumers in the Rochester area and that this harm will be irreparable.

If the acquisition is allowed to stand, the Rochester regional market will be unique. There was testimony that if Kaufmann's continued as the only traditional department store in the area, with only J.C. Penney and Sears as competitors, it would be a unique situation not matched in the top fifty metropolitan markets in the country. Max Thomas Grumbacher, Chairman and Chief Executive Officer of Bon–Ton, testified that the Rochester metropolitan area with a population of over a million was the thirty-first largest retail market in the country. He knew of no other similar market dominated by only one traditional department store. (Tr. 53).

Similarly, Bernard Olsoff, who worked for May for twelve years as President of its Merchandise Division, and had a total of over forty years experience in merchandising, testified that he knew of no market the size of the Rochester market that was served by only one department store. (Tr. 320). This testimony was unrebutted.

Robert Warner testified that if he were the president of Kaufmann's, and if Kaufmann's were the only department store in the area, he would run fewer sales, and cut prices less deeply during sales. He stated that customers "would get hurt, because they would be spending much more money for their merchandise." (Tr. 346).

Similarly, plaintiffs' expert Dr. Richard Higgins has concluded that in areas with relatively few department stores, department stores generally reap higher profits. Bernard Olsoff testified that with just one traditional department store in the Rochester market (not counting J.C. Penney), "the consumer will be deprived of choice, and they will be deprived of the price advantage that competition brings." (Tr. 320).

I find this evidence persuasive. These opinions are supported by the convincing evidence that department stores set their prices largely based on their careful monitoring of each other's prices. It is not difficult to believe, therefore, that in the absence of competing department stores, Kaufmann's

prices would be higher on average, that they would have fewer sales, and that consumers would suffer accordingly. The public interest, therefore, weighs in favor of enjoining this sale.

### Injury to Bon–Ton

■■ One of the defenses raised by defendants is that Bon–Ton has no standing to sue here since it has not suffered any antitrust injury. The point is somewhat academic, however, because defendants concede that the State is a proper party plaintiff. But, in any event, I do not agree with defendants' contentions concerning Bon–Ton. There is a direct nexus between an anticompetitive act—May's acquisition of McCurdy's assets—and the alleged injury to Bon–Ton: its effective exclusion from the Rochester market. Courts have held in many cases that a business which has been prevented from entering (and thus competing in) a market have standing to sue under the antitrust laws. *See, e.g., Los Angeles Memorial Coliseum Comm'n v. National Football League,* 791 F.2d 1356 (9th Cir.1986), *cert. denied,* 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987); *Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555 (5th Cir.1984), *cert. denied,* 474 U.S. 1053, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986).

In *Consolidated Gold Fields,* the Second Circuit held that the target of an acquisition had antitrust standing because its "loss of independence [which would result from the acquisition] is causally linked to the injury occurring in the marketplace, where the acquisition threatens to diminish competitive forces." 871 F.2d at 258. Likewise, Bon–Ton's inability to compete in the Rochester market is causally linked to the acquisition at issue here. There has been extensive testimony concerning the need for department stores today to locate in shopping malls as opposed to other types of locations. Even defendants' expert, James Mack Folsom, admitted that he was unaware of department stores currently locating new stores in non-mall locations. (Tr. 447). By acquiring two of the only available mall sites in the Rochester area, May would raise significant barriers to Bon–Ton's entry into the market.

That is precisely the harm alleged here by Bon–Ton.

### *CONCLUSION*

"It is axiomatic in antitrust jurisprudence that a federal court has broad discretion to remedy violations of the law." *Trustees of A.J. Bremen Realty Trust v. City of Boston,* Civ. No. 84–2431–MA, 1985–1 Trade Cas. (CCH) P66,520, 1985 WL 6083 (D.Mass. Mar. 12, 1985). Where an antitrust violation exists, therefore, "the district court 'has the duty to compel action ... [to] cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.'" *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.,* 633 F.2d 477, 485 (7th Cir.1980) (quoting *United States v. Ward Baking Co.,* 376 U.S. 327, 330, 84 S.Ct. 763, 766, 11 L.Ed.2d 743 (1964)).

Doubts as to the necessity of issuing a preliminary injunction should be resolved in favor of granting the injunction. *Consolidated Gold Fields,* 871 F.2d at 261. This is often especially true in antitrust cases, where, once the proposed merger or acquisition is consummated, "it becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs.' A preliminary injunction is therefore the remedy of choice for preventing an unlawful merger." *Id.* (quoting *Sonesta Int'l Hotels Corp. v. Wellington Assoc.,* 483 F.2d 247, 250 (2d Cir.1973)).

Therefore, the following is hereby ORDERED AND DECREED:

Plaintiffs' request for a preliminary injunction is granted and defendants' motions to dismiss are denied.

The Asset Purchase Agreement, dated July 1, 1994, between McCurdy & Company, Inc. and The May Department Stores Company is hereby vacated and annulled.

The May Department Stores Company is directed to divest itself of all McCurdy's assets obtained by virtue of the July 1, 1994 Asset Purchase Agreement, and to return any consideration paid on account of such assets.

Defendant May Department Stores Company, and its officers, directors and agents,

and any subdivision or other corporation controlled by the May Department Stores Company, is enjoined, pending the final determination of this action, from acquiring or attempting to acquire in any manner controlling interest in the stock or assets of McCurdy & Company, Inc., consisting of real property and structures, in the Rochester metropolitan area, that is in Monroe and Ontario Counties, New York.[7]

IT IS SO ORDERED.

---

7. There has been no application for posting of a bond and no discussion or proof whatsoever submitted by any of the parties concerning the need for, or amount of, such a bond. *See* Rule 65(c), Fed.R.Civ.P.; 15 U.S.C. § 26.

In light of the absence of an application and the lack of proof, I have not entered any order concerning a bond. Absent a stipulation concerning the matter, the parties are directed to file papers relative to the posting of a bond, the need for it, the amount of it and whether the State is exempt from such a requirement, within ten days of entry of this Order. The Court will determine the matter on the papers, unless it decides to entertain oral argument.